**John W. McCRORY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68864.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 15, 1982.
Rehearing Denied Jan. 26, 1983.

M.P. Duncan, III, R. William Wood, Denton, for appellant.

Jerry Cobb, Dist. Atty., Denton, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

OPINION

CLINTON, Judge.

In his second ground of error, the appellant contends it was error to admit his oral statement of June 12, 1978, to John T. Holbrook, which was the "result of custodial interrogation." Finding merit in this contention, we are constrained to reverse.

An oral statement made by an accused as a result of custodial interrogation between August 29, 1977 and August 31, 1981, is admissible only for impeachment purposes and only when the statement is shown to comply with the version of Article 38.22, § 3(a) and (b) which was in effect. The State, however, does not contend appellant's statement was admitted for impeachment, nor given in compliance with § 3, supra, but instead, asserts it was admissible pursuant to § 5 of Article 38.22, supra, because it did not "stem from custodial interrogation." [1]

 The determinative issue thus presented is whether appellant was "in custody" at the time he made the oral statement.[2] "[W]e find it difficult to formulate a general rule to distinguish custodial interrogation from non-custodial interrogation. A case by case approach in which the evidence is reviewed ... is deemed necessary." *Ancira v. State,* 516 S.W.2d 924, 927 (Tex. Cr.App.1974). Further, it is well settled that interrogation can be "custodial" even though a person may not be under formal arrest.[3] *Id.;* cf. *Miranda v. Arizona,* 384

---

1. "Sec. 5. Nothing in this article precludes the admission of a statement made by the accused ... that does not stem from custodial interrogation...."

2. "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect ... amounts to interrogation." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

 Though the State's brief contains an obligatory assertion that appellant's statement was not the result of *interrogation* as defined above, it does not tarry on the matter, for, as will be demonstrated, the record reveals otherwise with clarity.

3. It is doubtful that Texas law recognizes such a thing as being placed under "formal" arrest. "A person is arrested when he has been placed under restraint or taken into custody...." Article 15.22, V.A.C.C.P. No form of words is required, *White v. State,* 601 S.W.2d 364 (Tex. Cr.App.1980). Cf. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J., concurring): "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, *in view of all the circumstances* surrounding the incident, *a reasonable person would have believed he was not free to leave.*" (Emphasis supplied.)

U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) [wherein it was stated, "By custodial interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise *deprived of his freedom of action in any significant way*" (emphasis supplied)].

▮ Therefore, in deciding whether particular interrogation was custodial, courts must consider numerous factors, in light of all the circumstances extant. With that responsibility in mind, we turn now to review the facts established on appellant's motion to suppress. Unless otherwise noted, events set out are undisputed.

In the early morning hours of June 3, 1978, the body of the teenaged victim was found. It was apparently later the same day that appellant, accompanied by his mother, came to the Denton County Sheriff's Office and reported that his fingerprints would be found on the victim's car. In a meeting with the Sheriff, Captain Dwight Crawford[4] and Texas Ranger Ralph Wadsworth,[5] appellant and his mother explained that the preceding night he had been having car trouble, so she was following him in another car. He pulled up to the place where the body of the victim and her car were later found, and stopped. He went to look at the other car, checked something under the hood then closed it. Both appellant and his mother insisted they had seen no one around.

Two days later, on June 8, appellant and his mother met Crawford and Ranger Wadsworth late in the evening at the Highland Village Police Department. The men left together in Wadsworth's car to go to the scene of the murder. Walking around in the dark, Crawford shined a flashlight on a steel stake in the ground "and at this time John McCrory asked the question, 'Is that where the body was found?'" Wadsworth

stated that from that statement, "I felt like he had more knowledge of the crime," that appellant was the "best suspect" they had at that time.

The next day, June 9, a staff meeting of the District Attorney, Sheriff, Chief of Police and Ranger Wadsworth was held. At that time a question arose as to whether a warrant to arrest appellant should be obtained. Though the testimony conflicts slightly, it appears the District Attorney did not believe enough evidence had yet been assembled, and advised the group "it would be better to hold off and wait."

According to Captain Crawford, appellant was the "best [suspect] we had" and no one else was being actively investigated "like John McCrory was;" by that statement Crawford said he meant "that the focus of [the] investigation was on John McCrory at that time." Thus, Crawford had at some point during this time encouraged appellant to take a polygraph examination and offered to set it up should appellant decide to do so; apparently appellant had decided to do exactly that, for the next thing our record reveals is that on June 12, a Monday, appellant met Crawford at his office and rode with him to Dallas, arriving at the offices of Wayne Baker and Associates at approximately 9:15 a.m., where they also met Ranger Wadsworth.

Wayne Baker, a 14 year veteran D.P.S. officer[6] and polygraph examiner, shared a suite of offices with an associate and John T. Holbrook, a forensic psychiatrist. Captain Crawford spent the first hour briefing Baker on the case and what appellant had told him about his involvement; Baker then talked to appellant for an hour, after which the polygraph examination began. Through a one way mirror in Baker's office, Crawford and Ranger Wadsworth were able to see and hear the entire examination.

4. Crawford testified he was the Captain over criminal investigation for the Denton County Sheriff's Department and was primarily responsible for the investigation in this case.

5. Wadsworth testified he had been assigned to assist Denton County in this case.

6. Baker testified that before he opened his private practice, he had been a polygraph examiner for the Texas Department of Public Safety for 7 years; before that he had been a highway patrolman for 7 and a half years.

After the polygraph, Baker left appellant in the laboratory for five to ten minutes in order to evaluate the results.

On his return to the laboratory, Baker advised that the polygraph indicated appellant had been deceptive in his responses. Baker then spent about 30 minutes explaining the polygraph process and why it might be that a person failed. During this time Baker also described to appellant the facilities in his office, including the fact that Dr. Holbrook was available.[7]

At the hearing, Baker explained that when he does polygraphs for law enforcement agencies and the exam indicates deception, "it's a part of the procedure . . . to go back in and seek truthful statements." This "post-test interview" is "more or less an interrogation process" which, by contrast with the polygraph itself, is "not in the form [of questions] that can be answered yes and no." Baker explained that he was encouraging appellant to make an admission that he killed the deceased. Defense counsel asked what kind of questions had been asked to elicit this admission. Baker's testimony:

> "A: Well, it was presenting—my opinion was based on the information given from his polygraph to me, that I believed that he did kill the girl. And I stated that to him and asked him to be truthful, to tell the truth about it, and this was repeated. I can recall Mr. McCrory saying very little. He assumed that position there with his hands folded, looking down, and getting a lot of stress to it. He looked like he was troubled a great deal by this. And I kept asking him to be truthful, to tell the truth about it. I did tell him that there was a psychiatrist at the office, that if he felt the need for that, he could certainly talk to him. And, *utilizing general stimulus techniques such as this, continued to do so until the time when he said, 'I did it.'*[8]

\* \* \* \* \* \*

Q: I would assume that there is . . . a psychological approach to this type of interrogation. Is that correct?

A: Yes, sir.

Q: I think you used the words 'techniques of interrogation.' Is that correct?

A: That is correct.

Q: And these would be your election to use the techniques that is going to vary from one individual to another individual, depending upon what your conclusions are about the psychological makeup of that individual, essentially?

A: You make assumptions, that is right.

Q: Did you develop with Mr. McCrory at that time, or did you form in your mind at that time any particular technique which you would use to elicit these admissions?

A: Yes, sir.

Q: OK. *And what was that technique that you used?*

A: *Condemning the victim.*

Q: And how does that work? Would you explain that process, that technique?

\* \* \* \* \* \*

A: It's just my own opinion that by condemning a victim you take the person you are interviewing out of the position of being the persecutor and make him the victim, himself. And it makes the true victim the persecutor. And therefore, it makes the interrogator the rescuer, and therefore, he has a stronger urge or it's much easier for him to make the admissions that he had been keeping back. And this is certainly my personal opinion on that.

Q: It's a manipulative type process?

A: Yes.

\* \* \* \* \* \*

Q: OK. And I think you said that when you told Mr. McCrory that he had been deceptive in the test and that—that

---

7. This was according to Dwight Crawford. Baker did not remember what he had said to appellant and could only describe his "normal procedure."

8. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

he had failed the test, I think you said that he went into this stress position?

A: I did notice that, yes, sir.

Q: And he continued a heavy stress upon his hands, is that correct?

A: Yes, sir.

Q: Were the fingers interlaced?

Q: Yes, sir, they were.

\* \* \* \* \* \*

Q: Now, let me ask a few questions relating to Dr. Holbrook. You observed during the course of the post-test interview that there was—that he was in this stress position again, and did you form a conclusion at that time as to why he might need psychiatric assistance?

A: No, sir, I didn't.

Q: Was the subject of a physician of this nature brought up?

A: Well, as a matter of fact, *in that type of an interview many times I will use, you know, if I believe a person has committed murder, using psychiatric counseling and so forth as another stimulus factor.*

Q: *To elicit admissions?*

A: *Yes.*

Q: OK.

A: And then sometimes they might really need a doctor. I don't really know, so I always felt it was a very safe and practical stimulus factor.

Q: And I take it by your statements, you were using Dr. Holbrook simply as another stimulus factor to get—

A: Not only—

Q: Assuming that you might need it, that it might be necessary?

A: Not only that, but that is part of it. But also as a—if he really needs to see a doctor, especially whenever they are showing that much anxiety. So I think both of those—

Q: It's a combination of both of them?

A: Yes, sir."

Baker also explained how he ultimately successfully employed the interrogation technique he had chosen for appellant:

"That was a statement I made to him. I made a statement to him and then

stated, 'That is approximately what happened, isn't it?' That was just preceding his statement of, 'I did it.' And that was this. And my stating to him again condemning the victim in this manner, 'That she was there by herself, and that you pulled up to assist her.' I preceded that by stating, 'I think I know about what happened. It was going to be something like this.' And stating that, 'You pulled up to help her and that she flirted with you, and you thought it was a sexual come-on, and being a man and so forth, you decided to take her up on it, and one thing just led to another and got out of hand, and that's about what happened, isn't it?' And he was in—I don't remember his hands being together at this time. *And like he just had taken as much as he could, and he said, 'I did it,* I want to talk with Dwight Crawford and Dr. Holbrook.' That is just about the way that went."

The record reflects that after appellant told Baker, "I did it," Baker left the room to tell Crawford and Wadsworth appellant had admitted the murder. (Both officers of course already knew, because they had perceived the statement through the one way mirror.) Crawford's description of subsequent events follows:

"I walked into the room, I sat down, and I talked to him a little bit. And he advised me he had done it, he had killed her.

\* \* \* \* \* \*

[This was] not [in response to] too much questioning, not any directed, more like a spontaneous flow because he had been talking to Wayne Baker all this time. *And Wayne had apparently—well, had gotten him to talking.* And when he asked to see me and I walked in there, and it was more of just an interruption, and it started right back again. I said, 'I understand you want to talk to me.' He said, 'Yes,' and the conversation started again about Jeana Melissa Walker and what had happened. And he said, 'Yes,' that he killed her.

\* \* \* \* \* \*

I don't recall asking a direct question. *What I was actually trying to do was to not let the situation stop.* In other words, when Baker walked out, I did not want everything just to go to pieces. *I wanted to try to pick up where Wayne Baker had left off,* and ease back into the situation *to maintain the same balance to where he would talk to me like he was talking to Wayne Baker.* And *I can't really say whether I—I just asked him,* you know, *did you*—I didn't say, 'Did you kill Jeana Melissa Walker?' No, sir.

\* \* \* \* \* \*

[I said,] 'I understand you want to talk to me, John.' 'Yes,' was his reply. And I said, 'What do you need to talk to me about?' And he said, 'It's about the Walker girl,' or—I said, '*Well, what about the Walker girl?*' And he said, 'Well, I killed her, but you won't believe my story, you won't believe it.'

\* \* \* \* \* \*

I said, 'Well, I won't know until you tell me.' \* \* \* He was being real thoughtful and thinking about what he was talking about. He paused a lot, he thought a lot; he meditated on what he was thinking about. And then, *finally when I felt like I had actual control, in other words, once I left him I could come back to him and talk to him again without losing what I had.* And I asked him did he want to talk—*'I understand you want to talk to Dr. Holbrook.'* And he said, 'Yes.' "

In the interim Baker had obtained Dr. Holbrooks' agreement to see appellant. However, appellant was not to be taken to the physician's office; instead, Dr. Hol-

brook entered the polygraph lab. Crawford repositioned himself alongside Ranger Wadsworth, on the other side of the one way mirror.

Dr. Holbrook could not remember exactly what Wayne Baker said when he entered his office, "something on the order that we have a man down here we're working with, he is charged with a crime, he's become upset, that he stated he wanted to talk to a doctor ... [a]nd asked me would I [see him], and I said yes, and I would determine whether he needed a doctor or not." According to Dr. Holbrook, "this is not a very uncommon event, that somebody might get—become distressed or there might be some medical question about somebody they are getting ready to examine...." Holbrook denied that he and Baker had ever discussed psychiatric counseling as a tool to gain an admission or confession from an interviewee, but conceded they had discussed the matter as a tool "[t]o get valid information." [9] Holbrook expressed surprise that one of the reasons Baker had come to get him that day was to have psychiatric counseling act as a stimulus factor to gain admissions from appellant and denied that he had ever knowingly taken part in such a procedure, stating, "Well, in my view, at least [we have never used my services for such a purpose]. I don't know what goes on in other people's minds."

Holbrook testified he entered the polygraph room, advised appellant he,

" ... was there to help him, and asked him if he was mentally upset, and that he didn't have to talk to me if he didn't want to, and I was there as a physician. He was off and on, tearful, and was picking at his cap, and sort of wringing

**9.** Holbrook also referred to an article he had coauthored with Baker's associate, Eric Holden, see Holbrook and Holden, "Why Polygraph and Psychiatry?" 10 Texas Trial Lawyer's Forum No. 1, 38, 41, 44 and 45 (1975), in which the essential thesis of the article was posited:

"The psychiatrist working jointly with the polygraph examiner is often able to determine [particular psychiatric afflictions affecting the examinee] and allow the examiner additional insight into their ramifications both to the stimuli presented the subject, and to the subject's autonomic responsivity."

In discussing a particular case history illustrative of the point, the article referred to a pretest determination "that this man would be primarily motivated by fear of the consequences of this act, should he be found guilty, but that he *would likely respond to an offer of medical help if he were denying truthful allegations.*"

The "offer of medical help" was characterized as "ego stimulation."

his hands from time to time. And he just blurted out what he told me." [10]

After hearing appellant's statement to Holbrook, Crawford had Baker provide an office with a typewriter. There, Crawford and Wadsworth reduced appellant's statement to Holbrook to writing and obtained his signature on it. It was undisputed that appellant was never warned of his right against self-incrimination or other guaranties secured by *Miranda v. Arizona, supra.* Thus, the trial court suppressed the written inculpatory statement, apparently (and correctly) perceiving it to have been a product of custodial interrogation.

Therefore, then, it seems appellant's quarrel with that ruling is simply that the custodial interrogation began at some point earlier in the day—not just when the officers began to reduce his admissions to writing.

Crawford claimed that, as a Denton County law enforcement officer, he had no authority to arrest appellant in Dallas County; repeatedly, when asked whether appellant was free to leave after admitting the murder to Baker, then to himself, then to Holbrook, Crawford replied:

"From *me?* Yes sir."

Crawford also testified as follows:

"Q: Would Mr. McCrory have been free to leave the premises [after Ranger Wadsworth heard the statement made to Wayne Baker]?

A: I doubt it.

\* \* \* \* \* \*

Q: And did those ... questions and subsequent answers [asked during the polygraph] lead you to believe that Mr. McCrory had killed Jeana Melissa Walker?

A: No sir.

Q: So ... if the conversation had been terminated at the time of the examination, Mr. McCrory ... would have been allowed to leave the premises at that point, is that correct?

A: That is correct.

Q: *Then your testimony is that the statement of Mr. McCrory to Wayne Baker is the point at which Mr. McCrory would not have been allowed to leave the premises, is that correct?*

A: That would have been up to an officer with authority in that jurisdiction.

Q: Texas Rangers have that authority?

A: Yes, sir.

Q: If you were a Texas Ranger, would you have allowed him to leave the premises?

[PROSECUTOR]: I'm going to object, Your Honor. That is pure speculation.

THE COURT: Sustained.

Q: Would you have told the Texas Ranger to arrest him at that point?

A: *I don't think I would have needed to.*

\* \* \* \* \* \*

Q: All right. *You assumed at that point that Mr. Wadsworth would have*

---

**10.** It is of interest that approximately two weeks later, the trial court *sua sponte* appointed Holbrook as the court's "disinterested expert" psychiatrist, to examine appellant to determine his competence, sanity and whether there was a probability he would commit future acts of violence which would constitute a continuing threat to society. This action came after the State moved for Holbrook's appointment, and the defense opposed it.

Holbrook's recitation admitted at trial of what appellant told him was as follows:

"He said he had bumped into the back of a girl's car in the country. He got out of the car and she got out of her car to check the damage, and apparently there appeared to be a little or no damage there. He said that she said they would go talk about the damage. He said he propositioned her, and they got into the car, she on the passenger's side and he on the driver's side. He said he felt her up a bit. He said at one point he hit her and raped her. He said that he told—she told him that she was going to tell her boyfriend and that her boyfriend would kill him. Now, that's—at that point he told me that he either hit her and choked her or choked her and hit her.

He got into his car, and he said that he got into his car and left, and he thought that he saw somebody in a pickup truck that might have been her boyfriend on that country road."

*arrested without any necessity of you telling him to do so, is that correct?*

A: *Yes, sir, I would say.*

Q: Then *as far as you were concerned,* Mr. McCrory at that point, *when he made that admission to Mr. Baker, was under arrest,* is that correct? *He would not have been allowed freedom to leave those premises,* is that correct?

A: *No, sir,* as far as my knowledge. But I couldn't arrest him.

 \* \* \* \* \* \*

Q: I understand that, *but you are not telling this Court today that you would have sat back and let a man who just admitted to capital murder, walk out of that building, are you?*

[objection overruled]

Q: Are you telling the Court that today, Mr. Crawford?

A: I testified earlier, as far as I was concerned, I did not have the authority to arrest him.

Q: Mr. Crawford—

A: As far as what Ranger Wadsworth would have done, *I think he would have arrested the man if he had tried to escape from the building, yes, sir."*

In this vein, Ranger Wadsworth was asked what he would have done if Captain Crawford had suggested that appellant should be arrested prior to the time he signed the written statement; his reply:

"That is a thought if [sic] question, and I don't think we would—he would ever been arrested *for he was not trying to escape* and I knew where he lived and where he works."

Wadsworth insisted that appellant was not in custody after making an admission to Wayne Baker; neither was he in custody after making admissions to Captain Crawford; nor was he in custody after telling Dr. Holbrook the whole inculpatory story.[11]

However, the *reason* Wadsworth stated he did not "arrest" appellant was his belief that an oral statement to a police officer

was inadmissible in court, and "that in order to have sufficient knowledge ... to effectuate an arrest on this Defendant, it would have required a written confession." So, after having heard appellant's statements to Baker, Crawford and Holbrook, Wadsworth's purpose in going into what he called "the interrogation room," was to obtain a written confession in order "to make an arrest."

Regarding the point at which appellant was finally "placed in custody," Crawford somewhat incongruously testified:

"Q: Captain Crawford, after John McCrory signed the written confession ... did you arrest him then?

A: *Yes, sir.*

Q: And was he charged with capital murder?

A: Yes, sir.

Q: *Actually, was it an arrest executed by Ranger Wadsworth other than yourself?*

A: *He was in the room,* yes, sir."

Ranger Wadsworth's description of the incident:

"Q: All right. And who arrested him at that time?

A: Actually it was—*the arrest came probably after we got back to Denton.*

Q: OK. *But was he taken into custody at that time?*

A: *Yes.*

Q: And was he taken in custody at approximately what time in the day, if you know?

A: It was 1:00 or thereafter, just about the time we were leaving Dallas [after he had signed a written statement]."

In the carefully reasoned and oft cited case of *Ancira v. State,* supra, (then) Commissioner Tom Davis, on behalf of a unanimous Court, wrote:.

"In *Windsor* [*v. United States*], supra,[12] ... the Court said, 'The Government agents' testimony that Windsor was not a

---

11. With this, the trial court did not agree. See *ante* at 731, and *post* at 733, n. 13.

12. 389 F.2d 530 (CA5 1968).

suspect and not under arrest when questioned in his motel room is belied by the facts of the case.... Windsor was definitely the central figure in their investigation....' "[13] 516 S.W.2d at 926. And quoting from *United States v. Phelps,* 443 F.2d 246 (CA5 1971):

"... [We] have noted several significant factors which should be considered in determining whether or not a defendant is in custody. For example, probable cause to arrest, subjective intent of the police, focus of the investigation, and subjective belief of the defendant have all been deemed relevant."

*Id.;* see also *Newberry v. State,* 552 S.W.2d 457 (Tex.Cr.App.1977); Annotation, 31 A.L. R.3d 565, 578 (1970).

Clearly this is the best rule, encompassing the most meaningful criteria for consideration of the issue. "The courts cannot be expected to decide cases solely on the basis of self-serving statements by the defendant or the interrogating officer." Smith, "The Threshold Question in Applying *Miranda:* what constitutes custodial interrogation?," 25 S.C.L.Rev. 699, 713 (1974).

Applying the facts of the instant case to the analysis adopted by the Court in *Ancira v. State,* supra, and reaffirmed in *Newberry v. State,* supra, it is not disputed that appellant was the focus of the investigation by the time he journeyed to Dallas with Captain Crawford. And after the polygraph examination had been completed, the "sole and only purpose was to interrogate ... [appellant] about" committing the murder; the murder was "the sole topic of conversation." *Ancira v. State,* supra, at 926.

After Wayne Baker's interrogative techniques proved successful with appellant's exclamation, "I did it; I killed her," whatever gaps had existed previously in the officers' probable cause to believe he had done so, vanished. See *Newberry v. State,* supra, at 461; *Ancira v. State,* supra, at 926.

At that point, Captain Crawford, though disclaiming personal authority to do so,[14] subjectively believed appellant would be detained should he attempt to leave. And even Ranger Wadsworth—who candidly confessed legally erroneous ideas about what would authorize him to "arrest," and the difference between taking one "into custody" and "arresting" him—explained that he and Crawford would not have arrested appellant "because he was not trying to escape." (Escape from what?)[15]

Indeed, it strains credulity to suggest appellant himself thought he could admit commission of this capital murder to Baker, shake hands around, glance at his watch as he informed the group he was late for another appointment, and walk out the door! No doubt appellant assessed the situation exactly as did Captain Crawford: once he had admitted the crime, he was no longer free to leave. In fact, under the factors we have considered, the record would support the conclusion that appellant was "in custody" from the moment Baker informed him that his responses during the polygraph examination indicated he was being deceptive and that Baker believed he had killed the victim. As in *Ancira v. State,* supra, the totality of the circumstances presented here belie Ranger Wadsworth's testimony that he would have let appellant leave at any time before he signed a written statement.

Circumstances distinguish this case from one in which a general investigation into an unsolved crime is shown, e.g., *Brown v. State,* 475 S.W.2d 938 (Tex.Cr.App.1971); *Jones v. State,* 442 S.W.2d 698 (Tex.Cr.App. 1969); neither do we have statements made

---

13. Of course the trial judge in the instant case indicated by his suppression of the statement, that Ranger Wadsworth's testimony that appellant was not in custody at the time of his written confession, was "belied by the facts."

14. The record somewhat paradoxically shows Captain Crawford later regained his "authority" to arrest appellant.

15. Even Dr. Holbrook was apparently under the impression appellant was in custody, for twice he referred to appellant as having been or being "charged with" the murder.

during a general on the scene investigatory process, see *Harper v. State*, 533 S.W.2d 776 (Tex.Cr.App.1976); nor is this a case in which the appellant was affirmatively informed that he was not under arrest or, in fact, permitted to leave the company of the officers to go about his business, e.g., *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Brooks v. State*, 580 S.W.2d 825 (Tex.Cr.App.1979).

■ The State would have us selectively consider and ignore isolated facts contained in the record so that undue emphasis is placed on the testimony of a single law enforcement officer that appellant was free to leave—a subjective attitude which the record reflects was in no way manifested, and certainly not communicated to appellant before, during or after his statement was made. But our determination is made, as it must be, upon the *totality* of the circumstances established. And those circumstances "actual[ly] indicat[ed] . . . cus-

tody, such that a reasonable person would feel he was not free to leave and break off [the interrogation]." *Stone v. State*, 583 S.W.2d 410 at 413 (Tex.Cr.App.1979); see also *Oregon v. Mathiason*, supra.

Moreover, we are not persuaded by the State's argument that, because Dr. Holbrook asked appellant no questions, the statement admitted could not have been made in response to interrogation. Again declining to selectively view circumstances, we hold the record as a whole clearly establishes appellant's statement "resulted from" a calculated *"practice"* which all agents of the State present knew was "reasonably likely to evoke an incriminating response" from him.[16] *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

Thus, the trial court erred in admitting appellant's oral statement to Dr. Holbrook for the jury's consideration at trial, over his

---

**16.** The dissent begins on the erroneous premise that a statement may not "result from custodial interrogation" unless it is made in immediate response to "questions," and then only if made to the very agent of the State who has asked the question to which the statement is responsive.

A careful review of *Miranda* reminds us that its genesis was the Court's "concern for the atmosphere of custodial interrogation of criminal suspects, in which no overt physical coercion nor patent psychological ploys have been applied." *Faulder v. State*, 611 S.W.2d 630, 638 (Tex.Cr.App.1979), cert. denied 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1980). Citing "psychologically oriented" interrogation, which is characterized by isolation, the assumption of guilt, minimization of the moral seriousness of the offense, blaming the victim or society, persistence, domination, alteration of interrogators who are respectively hostile then friendly, and, if all else fails, trickery, the Supreme Court observed the intent of this "modern practice" is to dissuade the exercise of the rights to silence and counsel. Reasoning that "incommunicado interrogation" is at odds guaranteed by the Fifth Amendment, unless adequate protective devices are employed to dispel "the compulsion inherent in custodial surroundings," the Court felt compelled to hold:

"In order to combat [pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his

rights and the exercise of those rights must be fully honored."
384 U.S. at 467, 86 S.Ct. at 1624.

The instant case provides an excellent example of the kinds of circumstances which prompted the *Miranda* decision. After appellant made a general admission to Baker, who patently "interrogated" him, Captain Crawford concluded *his* session with appellant by asking him if he wanted to see Holbrook. Appellant was not taken to Holbrook's office like the average patient who needed "help." Instead, Holbrook was brought to the polygraph lab so that the law enforcement officers could acquire the content of appellant's statement for *their* use. This by itself evinces "conduct" or "a practice" which they knew was "reasonably likely to evoke an incriminating response" within the meaning of *Innis* and *Miranda*, inter alia. See also *Wyrick v. Fields*, ―― U.S. ――, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).

We will never know whether *Miranda* warnings would have dispelled the compulsion inherent in the "practice" employed here. Cf. *Mathiason*, supra; and *Stone v. State*, 583 S.W.2d 410 (Tex.Cr.App.1979). But certainly it is of no consequence whatever that *Holbrook* was not an agent of the State or that *Holbrook* himself asked appellant no "questions," under the totality of the circumstances established in this case. The dissent's defense of Holbrook's motives merely serves to emphasize the responsibility of the agents of the State for the resulting confession.

objection. Because this statement contained the only conclusive evidence of the commission of a rape, its admission cannot be deemed harmless beyond a reasonable doubt.[17]

The judgment of conviction is accordingly reversed and remanded.

TOM G. DAVIS, Judge, dissenting.

The majority reverses appellant's conviction because his statement of June 12, 1978, to Dr. John Holbrook, which was the "result of custodial interrogation," was erroneously admitted into evidence at trial.

The majority opinion *assumes* that appellant's statement to Holbrook was the result of *interrogation.* The crux of the opinion concerns whether appellant was in custody when he made the statement to Holbrook. Even if appellant's admission to Wayne Baker did mean that he was not free to leave and was therefore in custody, there is no support in the record for the proposition that appellant's statement to Holbrook was the "result of" or "stemmed from" custodial *interrogation.*

Since August 29, 1977 the pertinent portions of Art. 38.22, V.A.C.C.P., have not excluded from admission into evidence all oral statements made by an accused while in custody. Under Sec. 5, "Nothing in this article precludes the admission of a statement . . . that does not stem from custodial interrogation. . . ."

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297, the Supreme Court stated that: "The starting point for defining 'interrogation' in this context is, of course, the Court's *Miranda* opinion. There the Court observed that '[b]y custodial interrogation we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added)." Accord, see *Newberry v. State,* 552 S.W.2d 457, 461 (Tex.Cr.App.1977).

Under the facts of the instant case, Holbrook was not a police officer or agent of the police and he did not question appellant.

Appellant voluntarily went to the police station on June 6, to explain his involvement in the case. He had not been asked to come in. On June 8, he voluntarily went to the police station and accompanied officers to the scene of the crime. On June 9, at a staff meeting attended by the District Attorney and officers investigating the case, it was determined that there was insufficient probable cause to arrest appellant. On June 12, appellant voluntarily went to the police station and accompanied Captain Dwight Crawford to the polygraph examiner's office in Dallas.

Though Crawford had initially suggested the examination, appellant was in no way compelled to attend. Appellant specifically asked to go to the examination with Crawford, though appellant's mother had accompanied him to the police station.

*Before appellant made any admission to Wayne Baker,* i.e., *before he was in custody,* Baker told him of Holbrook's presence. *After* appellant told Baker, "I did it," he asked to see Holbrook and Crawford. As Crawford entered the examination room to see appellant, Baker went to ask Holbrook if he could come and talk to appellant.

Holbrook was told that appellant was being questioned about a criminal offense and had become upset. Baker said he might need a doctor and asked Holbrook to see him. Holbrook did not think he could help appellant, but agreed to see him.

According to the uncontroverted testimony of Holbrook, Holbrook identified himself, said he was there to help appellant and that appellant did not have to talk to him, and asked if appellant was upset. Other than this, Holbrook *asked no questions.* Appellant, tearful and nervous, told a rambling story and finally "blurted out" that he had raped the deceased and choked her.

---

17. In his ninth and tenth grounds of error, appellant assails the sufficiency of the evidence to establish his guilt. Suffice it to say that with Holbrook's testimony of appellant's oral admis-

sion, the quantum of circumstantial evidence of his culpability is ample to support the jury's verdict of "guilty."

Thus, those grounds of error are overruled.

Holbrook testified that he had never discussed psychiatric evaluation with Baker as a tool to stimulate confession and, that he *would be surprised if that is what Baker had in mind when he approached him on the 12th.* This is borne out by Baker's testimony:

"Q. OK. Now, you say you told Dr. Holbrook that you laid the predicate. By that, do you—had you and Dr. Holbrook—had you ever had any interviewees that had requested or that you had indicated the psychiatric assistance?

"A. Not in that particular manner, no, sir.

"Q. OK.

"A. I have used that technique many times, but this is the first time that it's ever been such where Dr. Holbrook was familiar with that particular type.

"Q. Had you ever had psychiatrists that—other psychiatrists available using this technique?

"A. No, sir.

"Q. OK. Did you tell Dr. Holbrook or indicate to Dr. Holbrook in any way as to the reason you had suggested Mr. McCrory see a psychiatrist?

"A. No, sir.

"Q. OK. When you say you laid a predicate for Dr. Holbrook, did you, by saying laying a predicate, indicate to Dr. Holbrook as to what you hoped he would be able to accomplish in his examination of Mr. McCrory?

"A. No, sir."

Thus, it is clear from the record that whatever Baker thought of psychiatric evaluation of a subject as a stimulus for confession, Holbrook did not utilize the same technique in general or in relation to the appellant. Holbrook *did* state that he had been asked before to see examinees who were distressed. He also stated that this was one reason he was leaving the office he shared with Baker since this happened on a "moment-to-moment" basis and was not professional.

The kind of psychiatric tool Holbrook knew and wrote about involved the psychiatrist discussing the pre-examination interview with the examiner in an effort to help the examiner frame proper examination questions for the examinee.

Holbrook never billed anyone for his encounter with appellant. He told no one of the content of appellant's statement until shortly before the trial and, he was unaware if any officers were viewing his discussion with appellant through the one-way mirror in Baker's office.

The foregoing establishes, and established for the trial court, that: appellant requested to see Holbrook; Holbrook did not question or interrogate appellant; Holbrook was not a police officer or an agent of the police. There was no "initiation of questioning by a police officer."

If appellant, after admitting guilt to Baker, had confessed to his mother, the statement would be admissible. *Autry v. State,* 626 S.W.2d 758 (Tex.Cr.App.1982). If he had confessed to a fellow inmate, the statement would be admissible. *May v. State,* 618 S.W.2d 333 (Tex.Cr.App.1981). Here, appellant confessed to a doctor, *who appellant asked to see.* According to the record in this case, the doctor was a private citizen who did not interrogate appellant in any manner. This record can in no way be interpreted so as to characterize Holbrook as an agent of the State.

It should be remembered that appellant was not in custody at the time Holbrook's availability was mentioned by Baker. That appellant was not in custody until he made an admission of guilt to Baker appears to be conceded in the majority opinion. Arguably, the majority position would be stronger if the availability of Holbrook had been mentioned after appellant was in custody. This fact negates any suggestion that Holbrook's encounter with appellant stemmed from a suggestion made while appellant was in custody.

It is significant that appellant gave the appearance of actively cooperating with po-

lice officers in the investigation of the case. The officers were not obliged to give him any *Miranda* warnings prior to his confession to Baker and they were completely free to employ any valid and legal technique in an effort to gain insight into the case. One of these techniques, as far as Baker was concerned, was mentioning the availability of psychiatric help. There is no reason this technique should be invalidated because appellant subsequently confessed to Baker.

The effect of the majority opinion is to overlook that portion of Art. 38.22, supra which allows the admission of a statement "that does not stem from custodial interrogation." It is universally conceded that a major purpose of the 1977 amendments to Art. 38.22 was to end the practice whereby any custodial admission was excluded from the State's case in chief regardless of whether it was the result of interrogation. *May v. State,* supra; *Lindley v. State,* 635 S.W.2d 541 (Tex.Cr.App.1982); Bubany, The Texas Confession Statute: Some New Wine in the Same Old Bottle, 10 Tex.Tech L.Rev. 67, 73–76 (1978). Today's decision in effect deletes a portion of the 1977 amendments.[1]

Accordingly, I dissent.

DALLY, W.C. DAVIS and McCORMICK, JJ., join in this opinion.

---

1. The decision in *Alfaro v. State,* 638 S.W.2d 891 (Tex.Cr.App.1982), has no bearing on the issues involved in the instant case. *Alfaro* concerned the standards to be used in the introduction of certain oral statements for purposes of impeachment. In *Alfaro* it was uncontested that the statements resulted from custodial interrogation. Here, appellant's statement to Holbrook did not result from interrogation.