Harold Anthony LaPOINT, Appellant,

v.

The STATE of Texas, Appellee.

No. 65441.

Court of Criminal Appeals of Texas, En Banc.

May 25, 1983.

Peter F. Doyle, Jr., Port Arthur, for appellant.

James S. McGrath, Dist. Atty., & John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appeal is taken from a conviction for attempt with the intent to commit burglary; after the jury found an allegation that appellant had been previously convicted of a felony was true, the punishment was assessed at 30 years confinement.

The sufficiency of the evidence is not assailed.

By his first ground of error, appellant complains of the trial court's permitting the State to introduce his incriminating oral declaration made to the arresting officer,— "I am burglarizing, sir,"—over his objection that he had not at that time been warned of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Article 38.22, V.A.C.C.P.

Appellant's second ground of error contends the trial court reversibly erred by failing to conduct a hearing on the voluntariness of the oral declaration.

Because resolution of both of these grounds of error depends upon whether the declaration in issue resulted from custodial interrogation,[1] we proceed to that determination.

The evidence established that Beaumont police officer R.E. Roberts and his partner were on patrol.duty on the morning of July 20, 1979; Roberts testified that his "beat" included his own neighborhood. At approximately 9:18, as the officers drove by the duplex in which Roberts and his mother resided, they noticed an unfamiliar white ten speed bicycle parked between Roberts' side of the duplex and the neighboring apartment building.

Roberts pulled the patrol car into the driveway, got out and started around the right side of the house; his partner went around to the left. When Roberts saw the back gate to the six foot fence surrounding the backyard was open, he removed his revolver from its holster. Roberts' direct testimony as to the subsequent events follows:

"Q: Did you notice anything unusual after you went through the gate?

A: Yes, sir.

Q: What would that be?

A: *I observed a black male standing with a knife.*[2]

Q: Okay. Can you tell us where in relation to the residence he was standing with this knife?

\*     \*     \*     \*     \*     \*

---

1. At the time of the commission of the offense, Article 38.22, V.A.C.C.P. provided in relevant part:

    "Sec. 5. Nothing in this article precludes the admission of a statement made by the ac-

cused ... that does not stem from custodial interrogation. . . ."

2. All emphasis is mine unless otherwise indicated.

A: About 4 feet.

Q: At that time were you surprised to see a black man standing there with a knife?

A: Yes, sir.

* * * [witness identifies appellant]

Q: Did you have an occasion to approach and discuss the situation with this gentleman behind your mother's house?

A: *I asked him what he was doing there.*

Q: Did he have any explanation to offer?

MR. DOYLE: Objection.

THE COURT: On what basis?

MR. DOYLE: Your Honor, the officer—the State hasn't established whether the *Miranda* Warnings were given.

THE COURT: Objection overruled. You may answer.

Q: Officer—

A: He stated *I am burglarizing, sir.*

Q: He said I am burglarizing, sir?

A: Yes, sir.

Q: Did that seem to be an accurate statement of what he appeared to be doing at that time?

A: After looking around at the evidence, yes, sir.

Q: Now, when you first saw this person can you describe what you were doing aside from just walking back there to investigate?

A: I approached the gate and observed it being partly opened. I drew my weapon because *I didn't know what I would find.*

As I come through the gate he was—he had a knife and was closing it and turned towards me.

Q: What happened after he turned towards you and closed the knife?

A: *He threw up his hands and made the statement.*

Q: Okay. Now, did you have an occasion to get closer to this man, the Defendant in this case? Did you go up to him?

A: Yes, sir, I placed him up against the wall and spread eagle.

Q: What did you do after that?

A: I asked him if there were any more persons with him. And he said no.

Q: Okay. Did you have an occasion to restrain him at that time?

A: *I placed the handcuffs on him after that.*

Q: Now, having restrained the Defendant in this case did you do what I would call a crime scene investigation right then and there?

A: Yes, sir.

Q: Would you tell the jury what you found in the course of your investigation?

A: I found the screen was missing off one of the windows right next to the back door.

Q: You say it was missing, Officer. Did you later discover it or find it?

A: Yes, I did. * * *

Leaning against the south side of the small utility room in the back.

Q: A place where it wouldn't be readily obvious to you?

A: No, you couldn't see it unless you walked around back."

On cross-examination, the matter was explored further:

"Q: Okay. In your instance I wouldn't call this a typical burglary being as . . . it was your house. And since you thought it was a burglary going on. Since it was your house were you mad?

A: Was I mad?

Q: Upset?

A: No, sir.

Q: Just calm?

A: Yes, sir.

Q: You went around the house with the gun and saw the Defendant?

A: Yes, sir.

Q: Did you know him?

A: No.

Q: *Did you have any inkling of what he was doing back there?*

A: No.

Q: *I would assume that you thought that he was attempting to commit a crime?*

A: *Not until I asked him what he was doing back there and he made the statement.*

Q: Was your house, your yard, your gun and a man you didn't know back there and you weren't sure what he was doing until after you asked him?

A: I mean I had my thoughts about what was going on but I did not go back there with the intent to accuse him of anything.

Q: What was your thought?

A: *I was wondering what somebody would be doing in my back yard.*

Q: I am trying to understand exactly what you were doing when you went back there. You went back there and you were thinking that you wondered what he was doing.

A: *I was wondering what someone would be doing back there or what a bicycle would be doing parked there...*

\* \* \* \* \* \*

Q: But you did not place him into custody until after you talked to him?

A: (No response.)

Q: Or before?

A: *Do you mean when I walked around the corner and first saw him?*

Q: Yes, sir.

A: *I asked what he was doing and he made the statement I am burglarizing and I told him to put his hands up against the wall."*

The thrust of appellant's argument is that because Officer Roberts was also a resident of the affected duplex, he had much more reason to believe that burglarious activity was afoot than would have the average officer upon seeing nothing more than a white bicycle parked in the yard, and accordingly, that appellant was under arrest the moment the officer confronted him

with his revolver drawn; since appellant was under arrest, he should have been warned before Roberts interrogated him. We cannot agree.

■ Only recently we have reiterated the appropriate analysis for determining whether one is "in custody" for Fifth Amendment purposes; significant factors to emphasize within the context of all facts and circumstances extant are,

"probable cause to arrest, subjective intent of the police, focus of the investigation, and subjective belief of the defendant...."

*McCrory v. State,* 643 S.W.2d 725, 733 (Tex. Cr.App.1982).

■ Appellant vehemently contends that he was the "focus of the investigation," citing numerous cases. But in each of those cases, law enforcement officers were already aware that a crime had been committed and were looking for its perpetrator. In the instant case, Officer Roberts had no specific idea as to what was going on, if anything, and was merely trying to find an explanation for the bicycle parked in his yard. Thus, there was no "investigation" of the type contemplated by *McCrory,* supra, and cases cited by appellant. *Williams v. State,* 524 S.W.2d 705 (Tex.Cr.App.1975). See *Thumann v. State,* 466 S.W.2d 738 (Tex. Cr.App.1971).

■ It follows from there that Officer Roberts had no "probable cause" to believe a crime had been or was being committed when he walked around his duplex and into the backyard. It was only after appellant's declaration that he was "burglarizing" that Roberts' general suspicion particularized and focused on appellant. Indeed, had Roberts taken appellant into custody at the moment he saw appellant, warned him of his Fifth Amendment rights to silence, counsel, etc., then elicited appellant's declaration, we would be hard pressed to uphold its admission into evidence vis-a-vis an allegation that it was the product of an illegal arrest. See *Green v. State,* 615 S.W.2d 700

(Tex.Cr.App.1980). Clearly, it was appellant's statement which gave Roberts probable cause to believe a burglary was in progress. *Wussow v. State,* 507 S.W.2d 792 (Tex.Cr.App.1974).

The "subjective intent of the police" involved in this incident is straight forward: they wanted to find out why a strange bicycle was parked in Roberts' yard; when Roberts asked appellant "What are you doing here?," he no doubt would have preferred a response such as "My kite dropped back here," to "I am burglarizing, sir." At any rate, the record reflects Officer Roberts was at least equally prepared to accept an explanation such as the former, as the latter, and in that event, send the intruder on his way. Compare *McCrory,* supra.

■ As to the "subjective belief of the defendant" we can only attempt to empathize with one in his position: While in the process of breaking into a house, to suddenly hear a voice ask "What are you doing here?," to then look up and see a uniformed police officer standing there, would be a startling event, to say the least. Appellant may have at that point believed he was "seized" within the meaning of the Fourth Amendment;[3] it is more likely, however, that—without considering the possibility that his deed had not yet been discovered and he might be free to walk away—he thought he had been "caught" and it would be in his best interest to tell the truth. Even if appellant did believe he was in custody, such belief surely was at least as much a product of his own *scienter* as any intent to restrain him manifested by Roberts.[4] See and compare *Davis v. State,* 516 S.W.2d 157 (Tex.Cr.App.1974) with *Brown v. State,* 437 S.W.2d 828 (Tex.Cr.App.1968).

In sum, balancing the relevant factors in the context of all the facts and circumstances shown, we hold appellant was not "in custody" at the time of his inculpatory declaration. Accordingly, the statement in issue did not "stem from custodial interrogation." *Terrill v. State,* 531 S.W.2d 642 (Tex.Cr.App.1976). As such, neither warnings nor a hearing on the voluntariness of the statement was required; the trial court committed no error by admitting appellant's oral declaration for the jury's consideration. Article 38.22, § 5, supra.

Both grounds of error are overruled.

The judgment of conviction is affirmed.

---

**3.** See *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) Stewart, J., concurring:

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."

**4.** Though appellant claims Roberts was pointing his revolver at him, no testimony to that effect was adduced, and under the circumstances presented, we do not deem it an irresistible inference.