Felix Edward CANTU, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 05–88–01194–CR, 05–88–01195–CR.

Court of Appeals of Texas,
Dallas.

Feb. 12, 1990.

Rehearing Denied March 16, 1990.

Jose A. Stewart, Dallas, for appellant.

Sharon Batjer, Asst. Dist. Atty., Dallas, for appellee.

Before WHITHAM, ROWE and WHITTINGTON, JJ.

OPINION

ROWE, Justice.

Felix Edward Cantu was convicted by a jury on two counts of the offense of aggravated sexual assault. The jury assessed punishment enhanced by two prior felony convictions at ninety-nine years' confinement in the Texas Department of Corrections and a fine of $5,000. In his first point of error, appellant contends that the trial court committed reversible error by admitting the testimony of a Department of Human Services (DHS) investigator as to statements made by appellant. We agree and remand the cause to the trial court for a new trial.

An officer with the Grand Prairie Police Department arrested appellant and charged him with two counts of the offense of indecency with a child. The arrest and charge were based on information obtained from an offense report and affidavits of the complaining witnesses supplied by Dallas County Child Welfare. The affidavits stated that appellant had sexually abused M. and A., the youngest daughters of his girlfriend Angie with whom appellant lived. At the time of his arrest, the police officers gave Miranda[1] warnings to appellant. While in custody at the Dallas County jail, appellant contacted Barbara Anderson, an intake investigator for the DHS who had been referred to the family.

Anderson filed a civil proceeding and received temporary managing conservatorship of the sisters and another child in the family who were then placed with their father. It was also Anderson's job to further investigate the charges against appellant and the family situation for the purpose of protecting the children. As part of

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

this investigation, Anderson interviewed the members of the family. Anderson had attempted unsuccessfully to interview appellant prior to his arrest. When appellant contacted her, Anderson went to the jail to interview him. Francesca Ramos, a DHS worker taking over the case, accompanied Anderson.

Anderson testified that she did not give appellant *Miranda* warnings. During the interview, appellant admitted to Anderson that he had been having sex with M., the sixteen-year-old sister, since she was thirteen years old but stated that M. requested it and willingly participated. He also stated that he had touched A., the twelve-year-old sister, over her panties when she was nine years old.

A. testified that appellant put his fingers inside of her vagina when she was nine years old. She stated that this continued three or four times a week until she was ten years old. M. testified that appellant had sex with her when she was twelve years old. She stated that appellant continued to have sexual intercourse with her once a week until she was fourteen years old excluding a period of about eighteen months when appellant left the house.

Francesca Ramos testified that Angie harassed her daughters in an attempt to make them drop the charges against appellant. She further stated that Angie had been supportive of appellant and not of her daughters in counseling and throughout the proceedings.

The medical examiner testified that A.'s hymen was completely disrupted, indicating penetration far enough into the vaginal cavity to stretch the hymen and cause it to tear. M.'s hymen was totally disrupted, indicating full vaginal penetration, probably more than twenty-five or thirty times.

■ In his first point of error, appellant contends that his statements to Anderson were the result of custodial interrogation and therefore inadmissible. We agree. Furthermore, we conclude that the introduction of the statements constituted reversible error.

The United States Supreme Court defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In Texas, non-law enforcement personnel may engage in custodial interrogation. *Cates v. State*, 776 S.W.2d 170, 174 (Tex.Crim.App. 1989) (DHS investigator); *McCrory v. State*, 643 S.W.2d 725, 733–34 (Tex.Crim. App.1982) (forensic psychiatrist). In *Cates*, the Texas Court of Criminal Appeals held inadmissible statements made by a defendant to a DHS investigator without prior *Miranda* warnings where the defendant was in custody for the offense of injury to a child and his statements were elicited in direct response to questions propounded by an investigator responsible for investigating the allegation of child abuse and turning her findings over to the proper authorities for prosecution. *Cates*, 776 S.W.2d at 174. The court remanded the case to the court of appeals for a determination of whether the introduction of appellant's statement was harmless. *Id.*

Anderson testified that she did not give *Miranda* warnings or any other warning to appellant indicating that his statements to her could be used as evidence against him. Without *Miranda* warnings, statements obtained from custodial interrogation are inadmissible. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. Therefore, the first question is whether appellant's statements were the result of custodial interrogation. If so, then the statements are inadmissible, and the next question is whether the introduction of the statements at trial was harmless.

The Court of Criminal Appeals in *Cates* determined that the DHS investigator was engaging in custodial interrogation because (1) the defendant was in custody on the charge of injury to a child; (2) the DHS worker was investigating the charge of injury to a child; and (3) the DHS investigator was required by law to turn her findings over to the appropriate police agency for prosecution. *Cates*, 776 S.W.2d

at 173–74. The starting point for the court was whether the "record as a whole … clearly establish[ed] that the defendant's statement 'resulted from a calculated practice' which all agents of the State present or involved knew was reasonably likely to evoke an incriminating response." *Id.* at 172 (quoting *McCrory*, 643 S.W.2d at 734).

As in *Cates*, appellant was in custody in the Dallas County jail on charges of indecency to a child when he talked to the DHS worker. Anderson had been investigating the allegations of sexual abuse. She had been unable to interview appellant as part of that investigation prior to arrest, even though she had attempted to contact appellant through Angie and several other people. Appellant called her from jail. Anderson went to the jail and questioned him. Francesca Ramos, the ongoing case worker, accompanied Anderson to the jail. Even though Anderson, as the intake investigator, had turned the case over to Ramos, Anderson talked with appellant at the jail. Appellant told Anderson that he had touched A. over her panties and that he had had sexual intercourse with M. Appellant also made a written statement which was notarized. Anderson testified that she did not tell appellant what to write. Anderson gave appellant's statement to Francesca Ramos, and it went into the record that was turned over to the police authorities. At trial Anderson testified as to what appellant told her. Additionally, his written statement was admitted into evidence. Anderson also admitted at trial that one purpose of these investigations is to elicit a confession from the defendant. Then, the confession is used in counselling with the children to help them overcome their sense of responsibility for what occurred.

We conclude that appellant's statements were the result of custodial interrogation for the reasons stated in *Cates*. Appellant was in custody. Anderson questioned him as part of the DHS investigation, and the responses made by appellant were turned over to law enforcement authorities. Furthermore, the DHS investigator expressly sought a confession from appellant; therefore, her questions were reasonably likely to evoke incriminating responses. Since Anderson did not inform appellant of his *Miranda* rights, his statements made to Anderson were inadmissible at trial.

■ Since we have determined that appellant's statements were inadmissible, the next question is whether the introduction of the statements at trial was harmless. Texas Rule of Appellate Procedure 81(b)(2) states the standard for determining whether error in a criminal case requires reversal. According to this rule, "The appellate court shall reverse the judgment under review unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." Tex.R.App.P. 81(b)(2). The Texas Court of Criminal Appeals recently set forth the following considerations for determining whether an error is harmless:

> In summary, a reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. Consequently, the court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error. In addition, the Court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity. In summary, the reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making; it should ask not whether the jury reached the correct result, but rather whether the jurors were able properly to apply law to facts in order to reach a verdict. Consequently, the reviewing court must focus upon the process and not on the result. In other words, a reviewing court must always examine whether the trial was an essentially fair one. If the error was of a

magnitude that it disrupted the juror's orderly evaluation of the evidence, no matter how overwhelming it might have been, then the conviction is tainted. Again, it is the effect of the error and not the other evidence that must dictate the reviewing court's judgment.

*Harris v. State,* No. 69,366, slip op. at 36 (Tex.Crim.App. June 28, 1989) (not yet reported). According to the *Harris* court, these considerations are to be used in applying this procedure: "First, isolate the error and all its effects, using the considerations set out above and any other considerations suggested by the facts of an individual case; and second, ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted." *Id.* at 36–37.

Following the procedure set out in *Harris,* the first step is to isolate the erroneously admitted evidence and examine the effects of its admission in light of the enumerated general considerations. On direct examination, Barbara Anderson testified over objection to statements made to her by appellant:

> A. [Appellant] told me he had touch[ed] [A.] but over her panties, and that he had been having sex with [M.].
> Q. Did he say how long he had been having sex with [M.]?
> A. Yes. [Appellant] stated that it had been since [M.] was 13.
>
> .  .  .  .  .
>
> Q. And did he tell you anything else about what had gone on with [M.]?
> A. Yes, he did. [Appellant] stated that he and [M.] had taken showers together. [Appellant] told me that [Angie] was always out of the home when this happened.

After this exchange, appellant wrote down his statements. These portions of his written affidavit were introduced into evidence:

> [A.] said is true and am guilty.
> [M.] is saying some of the *time!*
>
> .  .  .  .  .
>
> But I am guilty of having sex with her.
>
> .  .  .  .  .

All I did with [A.] was feel on her like she said.

> .  .  .  .  .

And the whole time this went on Angie didn't know nothing about it.

> /S/ [Appellant]

Once appellant's statements and affidavit were admitted through Anderson's testimony, the prosecutor used the statements to corroborate other testimony. In closing, the prosecutor stated in regard to Anderson's visit to the jail:

> She comes down to Lew Sterrett, and he tells her, yes, I had sex with [M.]. I touched [A.]. I did it when Angie was away, out of the home, just like the girls said.
> And she even had him write some of it down, and it may not be the most eloquent language in the world, but it's here in State's Exhibit 2 and you can look at that.
> These are statements made by [Appellant], not at Barbara Anderson's direction. She just let him write it as he wanted to write it.
> And what he says here, [A.] says it's true, and I am guilty. [M.] is saying, some of it's true, I'm guilty of having sex with her.
> All I did with [A.] was feel on her, like she said. The whole time this went on, Angie didn't know nothing about it. Those were his words, his signature, and what he's—
> THE DEFENDANT: Is he going to finish reading that?
> [PROSECUTOR]: From this man. That's who wrote that. You can take the victims' testimony, the medical testimony, and his own writing and his words, and you can convict this man. The evidence shows he's guilty of these two cases, and we'll ask you for a verdict to reflect that. Thank you.

The prosecutor made additional reference to appellant's statements on rebuttal to defense counsel's closing argument:

> Well, in this case, fortunately we have even more evidence. Because in this case we have this man's own words.

We have his words to Barbara Anderson that he had been having sex with [M.] since she was 13 years old. That's what we know. Out of his own mouth, that he had been having sex with [M.], that he had been taking showers with [M.]. He also admits that he had been fondling [A.].

And he didn't just say it orally, he put it in writing, so you have it right here in your hands to look at when you go back in the jury room.

Now, members of the jury, [defense counsel] said you should feel embarrassed or ashamed for convicting someone on this kind of evidence.

Well, members of the jury, what more evidence could there possibly be? What other evidence could there be besides the words of the victim, medical testimony, and the words of the defendant himself?

By focusing on the process and not on the outcome as required by *Harris,* we hold that the improper introduction of the statements was harmful. Even though the jury heard other testimony, the nature of appellant's statements is such that the jury would place great weight on them as opposed to the other evidence. Regardless of the credibility of the witnesses or the amount of other evidence, appellant's statements are capable of convincing some of the jurors to resolve all their doubts in favor of a guilty verdict and a harsh sentence. The State placed great emphasis on this inadmissible testimony. The prosecutor referred the jury repeatedly to appellant's "own words." For instance, he stated, "What other evidence could there be besides the words of the victim, medical testimony, and the words of the defendant himself?" One of the calculated results of the State's emphasis on appellant's own statements was to focus the jurors' attention on this evidence to the exclusion of other evidence. To this extent, the likelihood exists that the erroneously admitted evidence prejudiced the jurors' decision-making and compromised the integrity of the process leading to conviction. Ultimately, we conclude that the error was harmful, because on the record as a whole, we are unable to determine beyond a reasonable doubt that the error made no contribution to the conviction and punishment. We sustain appellant's first point of error.

Since we sustain appellant's first point, we do not reach his remaining points of error complaining that his statements were not voluntary and that the DHS investigator's testimony regarding M.'s and A.'s statements was improperly admitted as outcry statements.

The judgment of the trial court is reversed, and the cause is remanded for new trial.