# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00808-CR

**Santos L. Contreras, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF CALDWELL COUNTY, 274TH JUDICIAL DISTRICT
### NO. 2001-208, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Santos L. Contreras appeals a judgment convicting him of aggravated sexual assault of a child.  *See* Tex. Pen. Code Ann. ' 22.011(a)(2) (West Supp. 2004).  Appellant argues that (1) the jury convicted on factually insufficient evidence; (2) the trial court erred by excluding testimony by the child=s former stepmother that a doctor had diagnosed the child with a sexually transmitted disease before appellant allegedly sexually assaulted her; and (3) the trial court erred by admitting testimony from a Child Protective Services (CPS) worker concerning self-incriminating statements appellant made to her while in custody. We affirm the judgment of the trial court.

## BACKGROUND

Appellant originally lived in Illinois and had sole custody of his daughter, S.D., who came to live with him when she was six or seven.[1] He was married to Carla Contreras at that time, and they had two other children together. He and Carla Contreras divorced in Illinois.

Appellant moved to Texas with S.D. in the spring of 2001 when S.D. was twelve years old. They lived with various family friends in Caldwell County after the move, and in June 2001 they were living with Robin Ruiz. Ruiz=s house is a duplex and shares a wall with an adjoining family dwelling in which one man and his three-year-old daughter live. On June 29, 2001, Ruiz=s sister, Adela Vasquez, called for Ruiz to come into a bedroom where she found S.D. and Ruiz=s eleven-year-old daughter, J.V., both crying. S.D. told Ruiz, AI wanted to let you know my father has been having sex with me.@ Ruiz questioned S.D. further, discussed the situation with her husband, and called the Caldwell County Sheriff=s Department the next day to report the incident. Appellant was arrested. While in jail appellant signed paperwork voluntarily relinquishing his parental rights to S.D.

Ultimately, appellant was charged with four counts of sexual assault of a child, representing allegations of assaults on several occasions. A jury acquitted on three of the charges and convicted appellant on one that allegedly occurred in Ruiz=s house on June 27, 2001, which was two days before S.D.=s statements to Ruiz.

---

[1] The parental rights of S.D.=s mother have been terminated.

2

## DISCUSSION

*Evidentiary Rulings*

We will first consider appellant=s challenges to two evidentiary rulings of the trial court, which we review under an abuse-of-discretion standard. *Green v. State*, 934 S.W.2d 92, 100-02 (Tex. Crim. App. 1996); *Kelly v. State*, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992).

First, appellant asks us to review the trial court=s exclusion of some medical testimony as hearsay. Carla Contreras, appellant=s former wife and S.D.=s former stepmother, attempted to testify about statements made to her in Illinois by a doctor when S.D. was six or seven years old. Although that doctor allegedly had diagnosed S.D. with a sexually transmitted disease, S.D. had not alleged that appellant sexually assaulted her at that time. Appellant wished to introduce the doctor=s statements through Contreras to bolster other evidence in the record that S.D. had been sexually abused by others when she was younger and to argue other possible causes for the transection of S.D.=s hymen, a fact that the State had offered into evidence. The trial court sustained the State=s hearsay objections. Appellant argues that Contreras=s testimony falls within the medical diagnosis exception to the hearsay rule. *See* Tex. R. Evid. 803(4). We disagree.

Hearsay is Aa statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.@ Tex. R. Evid. 801(d). Rule 803(4) creates an exception to the hearsay rule for statements made Afor the purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception

or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.@ Tex. R. Evid. 803(4).

We analyze the exclusion of this out-of-court statement using a two-part test: (1) the declarant must make the statement for the purpose of receiving medical treatment, and (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis. *Moore v. State*, 82 S.W.3d 399, 411 (Tex. App.CAustin 2002, pet. ref=d) (Patterson, J., concurring) (citing *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985) and *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 277 (5th Cir. 1991)). Thus, the declarant must first have a motive consistent with obtaining medical care, knowing that proper diagnosis or treatment depends upon the veracity of such statements. *Id*. (citing *White v. Illinois*, 502 U.S. 346, 356 (1992) (A[A] statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility.@) and *United States v. Iron Shell*, 633 F.2d 77, 83-84 (8th Cir. 1980)). By satisfying these requirements, the out-of-court statement is deemed to be reliable.[2] *Id*. at 412.

Implicit in the first step of the two-part test is the concept that the hearsay statement must have been made *from* a patient *to* a medical treatment provider. *See* Tex. R. Evid. 803(4); *Moore*, 82

---

[2] Texas rule 803(4) is based on and is identical to the federal rule; therefore, federal case law is persuasive authority for interpreting and understanding the Texas rule. *See Fleming v. State*, 819 S.W.2d 237, 247 (Tex. App.CAustin 1991, pet. ref=d).

S.W.3d at 411-12 (Patterson, J., concurring); *Ware*, 62 S.W.3d at 351. The witness in court is the medical treatment provider, who is reporting the statements made by the patient. *See* Tex. R. Evid. 803(4); *Moore*, 82 S.W.3d at 411-12 (Patterson, J., concurring); *Ware*, 62 S.W.3d at 351.

In this case, the declarant is the physician from Illinois rather than the patient, and the declarant made the statement to communicate a medical diagnosis to S.D.=s former stepmother. The source of the hearsay statement was not the patient herself but the treating physician. As well, the witness through whom the statement was to be admitted was the former stepmother of the patient rather than the physician or treatment provider. This statement does not fall within the scope of the 803(4) exception to the hearsay rule because the statement was not made by the declarant for the purpose of seeking medical treatment. *See Moore*, 82 S.W.3d at 411 (Patterson, J., concurring). It lacks the indicia of reliabilityCthe patient=s selfish motive in receiving appropriate treatmentCthat forms the basis for the 803(4) exception. *See id*. at 413. Thus, the trial court did not abuse its discretion in excluding this evidence. We overrule appellant=s challenge to the trial court=s hearsay ruling.[3]

---

[3] We note that the record contains the testimony of two witnesses who spoke of the allegations of previous sexual abuse by persons other than appellant.

Next, appellant challenges the admission of certain self-incriminating evidence. When in jail after his arrest for the offense in this case, Tracy Lemons, a caseworker from CPS, interviewed him twice[4] in order to have him sign documents to relinquish his parental rights, pursuant to a civil proceeding based on the charges against appellant in this case.[5] Although appellant asked for a lawyer, Lemons did not read him his rights according to the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966), and as codified in article 38.22 of the code of criminal procedure. Neither did she provide him with a lawyer. According to Lemons,

> What Mr. Contreras told me during the visit was that he did not know what got into himCand he was referring to the abuseCwhen [S.D.] lived with him. He didn=t know what got into him. >It just wasn=t me= is what he said. He said that it seemed like it was someone else.

On appeal, appellant relies on two cases, *Paez v. State*, 681 S.W.2d 34 (Tex. Crim. App. 1984), and *Cates v. State*, 776 S.W.2d 170 (Tex. Crim. App. 1989), to challenge the admission of the statements he allegedly made to Lemons because she was acting as an agent of the State and obtained his statements in the course of a custodial interrogation. *See* Tex. Code Crim. Proc. Ann. art. 38.22, ' 2 (West Supp. 2004); *Paez*, 681 S.W.2d at 36 (citing *McCrory v. State*, 643 S.W.2d 725, 734 (Tex. Crim. App. 1982)).

---

[4] She visited appellant once with Nancy Shelton, a Court Appointed Special Advocates (CASA) volunteer, who also testified at appellant=s trial, and once with another person from CASA.

[5] Lemons also related instances of mental-health problems that S.D. exhibited in her foster-care placement, such as talking about suicide, pulling scabs off of her arms, eating staples, and other behaviors.

However, the record reflects that the jury also heard testimony concerning those statements from Nancy Shelton, a Court Appointed Special Advocates (CASA) volunteer who accompanied Lemons to the jail for the interview. She testified that she and Lemons spoke to appellant about relinquishing his parental rights and that he said to them, AI need to evaluate myself. I don=t know the man I=ve been the past two years. And I don=t know the person who has done this the past two years.@ She also testified that there were allegations from Cook County, Illinois, that an uncle and two half-brothers had sexually abused S.D. when she was six years old.

Appellant failed to object to Shelton=s testimony concerning the statements he allegedly made while in custody. A party must object each time the allegedly inadmissible evidence is offered. *See Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). Although appellant objected to Lemons=s report of his statements and the court ruled on that objection, any error the court may have committed was waived because of Shelton=s testimony. *See Penry v. State*, 691 S.W.2d 636, 655 (Tex. Crim. App. 1985). We overrule appellant=s challenge to Lemons=s testimony.

### *Factual Sufficiency Review*

Finally, appellant argues that the jury convicted on factually insufficient evidence. In determining the factual sufficiency of the evidence, the reviewing court views all the evidence in a neutral light and asks if Athe proof of guilt is so obviously weak as to undermine confidence in the jury=s determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.@ *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). The court Areviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to

**7**

disprove that fact.@ *Id*. at 7. Thus, the reviewing court looks at all the evidence on both sides and then makes a predominantly intuitive judgment. *Id*. AIn conducting its factual sufficiency review, an appellate court reviews the fact finder=s weighing of the evidence and is authorized to disagree with the fact finder=s determination.@ *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996).

At the same time, our review must show appropriate deference to the fact finder, and Aany evaluation should not substantially intrude upon the fact finder=s role as the sole judge of the weight and credibility given to witness testimony.@ *Jones v. State*, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996). Absolute deference is not the standard. *Johnson*, 23 S.W.3d at 8. The degree of deference must be proportionate with the facts we can accurately glean from the record. *Id*. Thus, we Amust defer to the jury=s determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.@ *Id*. Other evidence, such as the identification of a defendant, may be questionable as a result of evidence in the record, and the reviewing court may properly disagree with the jury while showing it proper deference. *Id*. at 8-9 (citing *Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997)). We conduct our review mindful of the fact that criminal defendants are not under any obligation to present evidence on their behalf, and the State must prove its case beyond a reasonable doubt. *See id*. at 11. If a defendant offers evidence contrary to that of the State, he may present the argument that Ahis evidence greatly outweighed the State=s evidence to the extent that the contrary finding is clearly wrong and manifestly unjust.@ *Id*.

In addition to the testimony of Lemons and Shelton, which we reviewed above, the record in this case contains much evidence introduced by both the State and appellant. The child in this case is S.D., the daughter of appellant. She was twelve years old when the assault allegedly occurred, at which time appellant had custody of her. She testified that (1) on June 27, 2001, she and appellant were sleeping together on a sofa bed in the living room of Ruiz=s house; (2) during the night, he took off her pants while she struggled against him and told him to stop; (3) he had sexual intercourse with her; (4) after he finished having sexual intercourse with her, she watched him squeeze white liquid out of his penis; (5) she had to clean herself up afterwards and returned to bed after appellant had fallen asleep; and (6) other assaults had occurred before that date.[6] She described the sexual activity but denied having seen appellant=s penis. Finally, she testified that she told Ruiz about the assault, and she recalled making a written statement to the police and being videotaped while she spoke to investigators from CPS.

Although her testimony in court alleged a sexual assault in Ruiz=s living room, S.D. reported a different version of the facts during an interview with a CPS worker, videotaped at a shelter on July 3, 2001. At that time, S.D. told the CPS investigator that appellant had sexual intercourse with her only one time at Ruiz=s house, on a different date and in a different room than alleged.[7] When asked at trial which of her statements was true, her earlier testimony in court or her statement on the videotape, S.D. responded, ABoth.@

---

[6] The jury returned not-guilty verdicts for charges based on those other alleged assaults.

[7] J.V. is Ruiz=s eleven-year-old daughter.

J. V., Ruiz=s eleven-year-old daughter, testified that on June 27, 2001, appellant and his daughter were staying at her house. She got up during the night to get a drink of water. As she passed by the living room, where appellant and his daughter were sleeping, she heard S.D. saying, ANo Daddy. No.@

Ruiz testified that appellant had been a family friend for many years. When appellant and his daughter moved to Texas, they stayed with Ruiz or other members of her family. About June 29, 2001, S.D. told her that her father had been having sex with her, most recently on June 27. She was crying as she told Ruiz this story. She begged Ruiz not to confront her father because she was afraid he would leave her. Although Ruiz did not immediately believe this story, she reported it to the Caldwell County Sheriff=s Office. She also testified that her house was a double duplex and that her neighbor=s daughter sleeps in a room that shares a wall with the room in which appellant and his daughter were sleeping. She also testified that S.D. had a reputation for untruthfulness although she had never lied to her.

Pediatrician Beth Nauert testified that on September 26, 2001, she interviewed S.D. and performed a physical examination that included a magnified visual inspection of the genital-rectal area. She related that S.D. told her that appellant had vaginal intercourse with her and performed oral sex on her twice a week for several years. The exam revealed that there were Atwo areas of break or transsection@ in the hymen. Nauert said this physical evidence was consistent with penetration by a penis but did not prove penile penetration and could be caused by play injury. She found no rectal lacerations. She also stated that S.D. tested negatively for sexually transmitted diseases and pregnancy.

Through Paul Cowen, an investigator with the Caldwell County Sheriff=s Office, the State offered S.D.=s victim statement, in which she described in detail the alleged June 27 assault. The allegations

in that statement were consistent with S.D.=s and J.V.=s testimony.  He also testified that, although S.D. reported that there might have been semen left on the blankets and bedding, neither he nor any other investigating officer attempted to recover that evidence.

Gail Martin, S.D.=s therapist, testified that S.D. has had suicidal thoughts, sleep problems, memory flashbacks that create fear and anxiety, and traumatic dreams; has acted out sexually; and has self-mutilated.  She also testified that images of appellant appear in S.D.=s dreams, memory flashbacks, and fears, and that S.D. has reported that appellant sexually abused her.  Martin has diagnosed S.D. with post-traumatic stress disorder as a result of sexual abuse but indicated that S.D.=s symptoms could result from other mental health problems or from sexual abuse by people other than appellant.

Appellant offered the testimony of eight witnesses.  First, Crystal Vasquez, with whom appellant and S.D. lived for some time in the spring of 2001, testified that appellant and S.D. were affectionate to each other.  Appellant would hug S.D. and kiss her on the forehead, and they would have their arms around each other.  She also related that she had been pregnant and had morning-sickness related nausea while appellant and S.D. lived with her.  She believed that S.D. imitated her pregnancy symptoms during that time period.

Next, Adela Vasquez, who had known appellant for sixteen years, testified that S.D. acted normally around appellant.  She thought appellant acted normally towards his daughter but was a little more strict with her than Adela Vasquez was with her own children.  She believed that appellant treated S.D. the way a father normally treats his daughter except that S.D. had more adult-like responsibilities for household chores.

**11**

Carla Contreras, appellant=s ex-wife, also testified on his behalf. S.D. lived with her for five or six years during the eight years that she was married to appellant. She testified that S.D. had wanted to live with her mother rather than with appellant, and she was adamant about her desires. She considered S.D. to be the main reason for her divorce from appellant and had warned him at the time of the divorce that S.D. Awas so intent on getting back with her mother that she would have done anything or destroyed anything that got in her way.@

Crystal and Adela Vasquez, Carla Contreras, and additional witnesses Robert and Manuel Vasquez testified that they believed that appellant had a reputation for truthfulness, and that S.D. often lied.

David Navarre, a registered sex-offender treatment provider, testified that he had tested and examined appellant. He tested appellant by two widely used methods to determine the presence of psychopathy.[8] He gave at least one of these tests to appellant in Spanish because appellant has an easier time reading and communicating in Spanish rather than in English. Navarre found the results of his tests to be unremarkable and stated that he Adidn=t see anything in there that would cause me to have a concern about the way this man responds to children or thinks about sex.@ He did not think that appellant could be capable of committing the offense for which he was charged.

---

[8] These methods have a published error rate of five percent. Navarre explained that the error rates mean that if one hundred individuals with a particular psychopathy were tested by one of these methods, a trained treatment provider could detect the presence of the psychopathy in ninety five of those individuals.

Finally, appellant testified on his own behalf. S.D. had lived with him for six or seven years before his arrest. The parental rights of S.D.=s mother had been terminated, and thus S.D. went to live with appellant while he was married to Carla Contreras in Illinois. In Illinois, he had put S.D. in therapy because of concerns he had about her mental health. She had shaved her head once because appellant and Carla Contreras had put restrictions on her visits with a grandmother, she hid dirty dishes under her bed, and she was generally disruptive in the household. He testified that S.D. did not want to move from Illinois to Texas because she did not want to be far away from her mother and other relatives she had in Illinois. Although S.D. mostly slept in the same bed as J.V. when they lived with Ruiz, sometimes she would sleep with appellant because she would become afraid at night. He slept in his clothes with no blanket, and S.D. slept in pajama-type clothing under a blanket. About a week before S.D.=s outcry, he had told her that he did not have enough money for them to move back to Illinois.

Appellant denied having any sexual contact with S.D. He testified that he had a difficult time communicating with Shelton and Lemons when they interviewed him in jail. He is a Mexican national[9] and has difficulty speaking and understanding English fluently.[10] He had no translator present and was separated from Lemons and Shelton during the interview by a pane of glass, which had a few half-moon shaped holes through which to speak. He had to shout at times in order to be heard.

---

[9] Appellant is a legal permanent resident of the United States.

[10] Appellant testified that he never formally learned English and that he mainly thinks in Spanish. In addition, the record indicates that he had a translator with him while he was testifying in order to explain more difficult concepts to him in Spanish. Finally, he testified that he has difficulty constructing sentences in English that reflect English rather than Spanish grammar, and the record shows some grammatical problems with his spoken English. However, he delivered most of his testimony unaided.

**13**

Finally, the physical evidence in this case consisted only of some hand-drawn maps of Ruiz=s house, the videotape of S.D.=s initial interview with CPS, J.V.=s typed witness statement, appellant=s signed relinquishment papers, and CPS casenotes concerning its care of S.D.

Although the physical evidence and the testimony concerning appellant=s psychological profile and S.D.=s symptoms of abuse do not necessarily establish that appellant committed an assault, neither do they disprove it. Thus, we are only left with conflicting testimonial evidence about the events and about the credibility of the witnesses. We recognize that there may be some problems with the evidence: some is contradictory; some does not necessarily tie appellant to the offense alleged; appellant=s comments to Lemons and Shelton may not be reliable given the circumstances under which they were obtained. However, the essential claim of appellant=s factual sufficiency challenge is one of weighing contradictory evidence. The task of determining the credibility of witnesses and choosing which testimony to believe remains with the jury.[11] *See Johnson*, 23 S.W.3d at 8. We will not reverse a conviction on such a claim. *See id*. Appellant has not shown that the evidence is so obviously weak as to undermine confidence in the jury=s determination. *See id*. at 11. Neither has he shown the proof of guilt is greatly outweighed by contrary proof. *See id*. We overrule appellant=s factual sufficiency challenge.

## CONCLUSION

Because we overrule all of appellant=s issues, we affirm the judgment of conviction.

---

[11] We note that the jury acquitted appellant of three charges alleging assaults on different dates and based on identical or substantially similar evidence.

14

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed:   February 20, 2004

Do Not Publish