TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





 NO. 03-02-00808-CR





Santos L. Contreras, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF CALDWELL COUNTY, 274TH JUDICIAL DISTRICT

NO. 2001-208, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 Santos L. Contreras appeals a judgment convicting him of aggravated sexual assault
of a child. See Tex. Pen. Code Ann. § 22.011(a)(2) (West Supp. 2004). Appellant argues that (1)
the jury convicted on factually insufficient evidence; (2) the trial court erred by excluding testimony
by the child's former stepmother that a doctor had diagnosed the child with a sexually transmitted
disease before appellant allegedly sexually assaulted her; and (3) the trial court erred by admitting
testimony from a Child Protective Services (CPS) worker concerning self-incriminating statements
appellant made to her while in custody. We affirm the judgment of the trial court.


BACKGROUND

 Appellant originally lived in Illinois and had sole custody of his daughter, S.D., who
came to live with him when she was six or seven. (1) He was married to Carla Contreras at that time,
and they had two other children together. He and Carla Contreras divorced in Illinois. 

 Appellant moved to Texas with S.D. in the spring of 2001 when S.D. was twelve
years old. They lived with various family friends in Caldwell County after the move, and in June
2001 they were living with Robin Ruiz. Ruiz's house is a duplex and shares a wall with an adjoining
family dwelling in which one man and his three-year-old daughter live. On June 29, 2001, Ruiz's
sister, Adela Vasquez, called for Ruiz to come into a bedroom where she found S.D. and Ruiz's
eleven-year-old daughter, J.V., both crying. S.D. told Ruiz, "I wanted to let you know my father has
been having sex with me." Ruiz questioned S.D. further, discussed the situation with her husband,
and called the Caldwell County Sheriff's Department the next day to report the incident. Appellant
was arrested. While in jail appellant signed paperwork voluntarily relinquishing his parental rights
to S.D. 

 Ultimately, appellant was charged with four counts of sexual assault of a child,
representing allegations of assaults on several occasions. A jury acquitted on three of the charges
and convicted appellant on one that allegedly occurred in Ruiz's house on June 27, 2001, which was
two days before S.D.'s statements to Ruiz. 


DISCUSSION

Evidentiary Rulings

 We will first consider appellant's challenges to two evidentiary rulings of the trial
court, which we review under an abuse-of-discretion standard. Green v. State, 934 S.W.2d 92,
100-02 (Tex. Crim. App. 1996); Kelly v. State, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992). 

 First, appellant asks us to review the trial court's exclusion of some medical
testimony as hearsay. Carla Contreras, appellant's former wife and S.D.'s former stepmother,
attempted to testify about statements made to her in Illinois by a doctor when S.D. was six or seven
years old. Although that doctor allegedly had diagnosed S.D. with a sexually transmitted disease,
S.D. had not alleged that appellant sexually assaulted her at that time. Appellant wished to introduce
the doctor's statements through Contreras to bolster other evidence in the record that S.D. had been
sexually abused by others when she was younger and to argue other possible causes for the
transection of S.D.'s hymen, a fact that the State had offered into evidence. The trial court sustained
the State's hearsay objections. Appellant argues that Contreras's testimony falls within the medical
diagnosis exception to the hearsay rule. See Tex. R. Evid. 803(4). We disagree. 

 Hearsay is "a statement, other than one made by the declarant while testifying at the
trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). 
Rule 803(4) creates an exception to the hearsay rule for statements made "for the purposes of
medical diagnosis or treatment and describing medical history, or past or present symptoms, pain,
or sensations, or the inception or general character of the cause or external source thereof insofar 
as reasonably pertinent to diagnosis or treatment." Tex. R. Evid. 803(4). 

 We analyze the exclusion of this out-of-court statement using a two-part test: (1) the
declarant must make the statement for the purpose of receiving medical treatment, and (2) the
content of the statement must be such as is reasonably relied on by a physician in treatment or
diagnosis. Moore v. State, 82 S.W.3d 399, 411 (Tex. App.--Austin 2002, pet. ref'd) (Patterson, J.,
concurring) (citing United States v. Renville, 779 F.2d 430, 436 (8th Cir. 1985) and Rock v. Huffco
Gas & Oil Co., 922 F.2d 272, 277 (5th Cir. 1991)). Thus, the declarant must first have a motive
consistent with obtaining medical care, knowing that proper diagnosis or treatment depends upon
the veracity of such statements. Id. (citing White v. Illinois, 502 U.S. 346, 356 (1992) ("[A]
statement made in the course of procuring medical services, where the declarant knows that a false
statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility.") and
United States v. Iron Shell, 633 F.2d 77, 83-84 (8th Cir. 1980)). By satisfying these requirements,
the out-of-court statement is deemed to be reliable. (2)
 Id. at 412.

 Implicit in the first step of the two-part test is the concept that the hearsay statement
must have been made from a patient to a medical treatment provider. See Tex. R. Evid. 803(4); 
Moore, 82 S.W.3d at 411-12 (Patterson, J., concurring); Ware, 62 S.W.3d at 351. The witness in
court is the medical treatment provider, who is reporting the statements made by the patient. See
Tex. R. Evid. 803(4); Moore, 82 S.W.3d at 411-12 (Patterson, J., concurring); Ware, 62 S.W.3d at
351. 

 In this case, the declarant is the physician from Illinois rather than the patient, and the
declarant made the statement to communicate a medical diagnosis to S.D.'s former stepmother. The
source of the hearsay statement was not the patient herself but the treating physician. As well, the
witness through whom the statement was to be admitted was the former stepmother of the patient
rather than the physician or treatment provider. This statement does not fall within the scope of the
803(4) exception to the hearsay rule because the statement was not made by the declarant for the
purpose of seeking medical treatment. See Moore, 82 S.W.3d at 411 (Patterson, J., concurring). It
lacks the indicia of reliability--the patient's selfish motive in receiving appropriate treatment--that
forms the basis for the 803(4) exception. See id. at 413. Thus, the trial court did not abuse its
discretion in excluding this evidence. We overrule appellant's challenge to the trial court's hearsay
ruling. (3) 

 Next, appellant challenges the admission of certain self-incriminating evidence. 
When in jail after his arrest for the offense in this case, Tracy Lemons, a caseworker from CPS,
interviewed him twice (4) in order to have him sign documents to relinquish his parental rights,
pursuant to a civil proceeding based on the charges against appellant in this case. (5) Although
appellant asked for a lawyer, Lemons did not read him his rights according to the requirements of
Miranda v. Arizona, 384 U.S. 436 (1966), and as codified in article 38.22 of the code of criminal
procedure. Neither did she provide him with a lawyer. According to Lemons, 


What Mr. Contreras told me during the visit was that he did not know what got into
him--and he was referring to the abuse--when [S.D.] lived with him. He didn't
know what got into him. 'It just wasn't me' is what he said. He said that it seemed
like it was someone else.


On appeal, appellant relies on two cases, Paez v. State, 681 S.W.2d 34 (Tex. Crim. App. 1984), and
Cates v. State, 776 S.W.2d 170 (Tex. Crim. App. 1989), to challenge the admission of the statements
he allegedly made to Lemons because she was acting as an agent of the State and obtained his
statements in the course of a custodial interrogation. See Tex. Code Crim. Proc. Ann. art. 38.22, § 2
(West Supp. 2004); Paez, 681 S.W.2d at 36 (citing McCrory v. State, 643 S.W.2d 725, 734 (Tex.
Crim. App. 1982)). 

 However, the record reflects that the jury also heard testimony concerning those
statements from Nancy Shelton, a Court Appointed Special Advocates (CASA) volunteer who
accompanied Lemons to the jail for the interview. She testified that she and Lemons spoke to
appellant about relinquishing his parental rights and that he said to them, "I need to evaluate myself. 
I don't know the man I've been the past two years. And I don't know the person who has done this
the past two years." She also testified that there were allegations from Cook County, Illinois, that
an uncle and two half-brothers had sexually abused S.D. when she was six years old. 

 Appellant failed to object to Shelton's testimony concerning the statements he
allegedly made while in custody. A party must object each time the allegedly inadmissible evidence
is offered. See Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). Although appellant
objected to Lemons's report of his statements and the court ruled on that objection, any error the
court may have committed was waived because of Shelton's testimony. See Penry v. State, 691
S.W.2d 636, 655 (Tex. Crim. App. 1985). We overrule appellant's challenge to Lemons's
testimony.


Factual Sufficiency Review

 Finally, appellant argues that the jury convicted on factually insufficient evidence. 
In determining the factual sufficiency of the evidence, the reviewing court views all the evidence in
a neutral light and asks if "the proof of guilt is so obviously weak as to undermine confidence in the
jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed
by contrary proof." Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). The court "reviews
the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute
and compares it with the evidence that tends to disprove that fact." Id. at 7. Thus, the reviewing
court looks at all the evidence on both sides and then makes a predominantly intuitive judgment. 
Id. "In conducting its factual sufficiency review, an appellate court reviews the fact finder's
weighing of the evidence and is authorized to disagree with the fact finder's determination." Clewis
v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). 

 At the same time, our review must show appropriate deference to the fact finder, and
"any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the
weight and credibility given to witness testimony." Jones v. State, 944 S.W.2d 642, 648 (Tex. Crim.
App. 1996). Absolute deference is not the standard. Johnson, 23 S.W.3d at 8. The degree of
deference must be proportionate with the facts we can accurately glean from the record. Id. Thus,
we "must defer to the jury's determination concerning what weight to give contradictory testimonial
evidence because resolution often turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered." Id. Other evidence, such as the
identification of a defendant, may be questionable as a result of evidence in the record, and the
reviewing court may properly disagree with the jury while showing it proper deference. Id. at 8-9
(citing Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997)). We conduct our review
mindful of the fact that criminal defendants are not under any obligation to present evidence on their
behalf, and the State must prove its case beyond a reasonable doubt. See id. at 11. If a defendant
offers evidence contrary to that of the State, he may present the argument that "his evidence greatly
outweighed the State's evidence to the extent that the contrary finding is clearly wrong and
manifestly unjust." Id. 

 In addition to the testimony of Lemons and Shelton, which we reviewed above, the
record in this case contains much evidence introduced by both the State and appellant. The child in
this case is S.D., the daughter of appellant. She was twelve years old when the assault allegedly
occurred, at which time appellant had custody of her. She testified that (1) on June 27, 2001, she and
appellant were sleeping together on a sofa bed in the living room of Ruiz's house; (2) during the
night, he took off her pants while she struggled against him and told him to stop; (3) he had sexual
intercourse with her; (4) after he finished having sexual intercourse with her, she watched him
squeeze white liquid out of his penis; (5) she had to clean herself up afterwards and returned to bed
after appellant had fallen asleep; and (6) other assaults had occurred before that date. (6) She described
the sexual activity but denied having seen appellant's penis. Finally, she testified that she told Ruiz
about the assault, and she recalled making a written statement to the police and being videotaped
while she spoke to investigators from CPS. 

 Although her testimony in court alleged a sexual assault in Ruiz's living room, S.D.
reported a different version of the facts during an interview with a CPS worker, videotaped at a
shelter on July 3, 2001. At that time, S.D. told the CPS investigator that appellant had sexual
intercourse with her only one time at Ruiz's house, on a different date and in a different room than
alleged. (7) When asked at trial which of her statements was true, her earlier testimony in court or her
statement on the videotape, S.D. responded, "Both."

 J. V., Ruiz's eleven-year-old daughter, testified that on June 27, 2001, appellant and
his daughter were staying at her house. She got up during the night to get a drink of water. As she
passed by the living room, where appellant and his daughter were sleeping, she heard S.D. saying,
"No Daddy. No."

 Ruiz testified that appellant had been a family friend for many years. When appellant
and his daughter moved to Texas, they stayed with Ruiz or other members of her family. About June
29, 2001, S.D. told her that her father had been having sex with her, most recently on June 27. She
was crying as she told Ruiz this story. She begged Ruiz not to confront her father because she was
afraid he would leave her. Although Ruiz did not immediately believe this story, she reported it to
the Caldwell County Sheriff's Office. She also testified that her house was a double duplex and that
her neighbor's daughter sleeps in a room that shares a wall with the room in which appellant and his
daughter were sleeping. She also testified that S.D. had a reputation for untruthfulness although she
had never lied to her. 

 Pediatrician Beth Nauert testified that on September 26, 2001, she interviewed S.D.
and performed a physical examination that included a magnified visual inspection of the genital-rectal area. She related that S.D. told her that appellant had vaginal intercourse with her and
performed oral sex on her twice a week for several years. The exam revealed that there were "two
areas of break or transsection" in the hymen. Nauert said this physical evidence was consistent with
penetration by a penis but did not prove penile penetration and could be caused by play injury. She
found no rectal lacerations. She also stated that S.D. tested negatively for sexually transmitted
diseases and pregnancy.

 Through Paul Cowen, an investigator with the Caldwell County Sheriff's Office, the
State offered S.D.'s victim statement, in which she described in detail the alleged June 27 assault.
The allegations in that statement were consistent with S.D.'s and J.V.'s testimony. He also testified
that, although S.D. reported that there might have been semen left on the blankets and bedding,
neither he nor any other investigating officer attempted to recover that evidence. 

 Gail Martin, S.D.'s therapist, testified that S.D. has had suicidal thoughts, sleep
problems, memory flashbacks that create fear and anxiety, and traumatic dreams; has acted out
sexually; and has self-mutilated. She also testified that images of appellant appear in S.D.'s dreams,
memory flashbacks, and fears, and that S.D. has reported that appellant sexually abused her. Martin
has diagnosed S.D. with post-traumatic stress disorder as a result of sexual abuse but indicated that
S.D.'s symptoms could result from other mental health problems or from sexual abuse by people
other than appellant. 

 Appellant offered the testimony of eight witnesses. First, Crystal Vasquez, with
whom appellant and S.D. lived for some time in the spring of 2001, testified that appellant and S.D.
were affectionate to each other. Appellant would hug S.D. and kiss her on the forehead, and they
would have their arms around each other. She also related that she had been pregnant and had
morning-sickness related nausea while appellant and S.D. lived with her. She believed that S.D.
imitated her pregnancy symptoms during that time period. 

 Next, Adela Vasquez, who had known appellant for sixteen years, testified that S.D.
acted normally around appellant. She thought appellant acted normally towards his daughter but was
a little more strict with her than Adela Vasquez was with her own children. She believed that
appellant treated S.D. the way a father normally treats his daughter except that S.D. had more adult-like responsibilities for household chores.

 Carla Contreras, appellant's ex-wife, also testified on his behalf. S.D. lived with her
for five or six years during the eight years that she was married to appellant. She testified that S.D.
had wanted to live with her mother rather than with appellant, and she was adamant about her
desires. She considered S.D. to be the main reason for her divorce from appellant and had warned
him at the time of the divorce that S.D. "was so intent on getting back with her mother that she
would have done anything or destroyed anything that got in her way." 

 Crystal and Adela Vasquez, Carla Contreras, and additional witnesses Robert and
Manuel Vasquez testified that they believed that appellant had a reputation for truthfulness, and that
S.D. often lied. 

 David Navarre, a registered sex-offender treatment provider, testified that he had
tested and examined appellant. He tested appellant by two widely used methods to determine the
presence of psychopathy. (8) He gave at least one of these tests to appellant in Spanish because
appellant has an easier time reading and communicating in Spanish rather than in English. Navarre
found the results of his tests to be unremarkable and stated that he "didn't see anything in there that
would cause me to have a concern about the way this man responds to children or thinks about sex." 
He did not think that appellant could be capable of committing the offense for which he was charged. 

 Finally, appellant testified on his own behalf. S.D. had lived with him for six or
seven years before his arrest. The parental rights of S.D.'s mother had been terminated, and thus
S.D. went to live with appellant while he was married to Carla Contreras in Illinois. In Illinois, he
had put S.D. in therapy because of concerns he had about her mental health. She had shaved her
head once because appellant and Carla Contreras had put restrictions on her visits with a
grandmother, she hid dirty dishes under her bed, and she was generally disruptive in the household. 
He testified that S.D. did not want to move from Illinois to Texas because she did not want to be far
away from her mother and other relatives she had in Illinois. Although S.D. mostly slept in the same
bed as J.V. when they lived with Ruiz, sometimes she would sleep with appellant because she would
become afraid at night. He slept in his clothes with no blanket, and S.D. slept in pajama-type
clothing under a blanket. About a week before S.D.'s outcry, he had told her that he did not have
enough money for them to move back to Illinois. 

 Appellant denied having any sexual contact with S.D. He testified that he had a
difficult time communicating with Shelton and Lemons when they interviewed him in jail. He is a
Mexican national (9) and has difficulty speaking and understanding English fluently. (10) He had no
translator present and was separated from Lemons and Shelton during the interview by a pane of
glass, which had a few half-moon shaped holes through which to speak. He had to shout at times
in order to be heard. 

 Finally, the physical evidence in this case consisted only of some hand-drawn maps
of Ruiz's house, the videotape of S.D.'s initial interview with CPS, J.V.'s typed witness statement,
appellant's signed relinquishment papers, and CPS casenotes concerning its care of S.D.

 Although the physical evidence and the testimony concerning appellant's
psychological profile and S.D.'s symptoms of abuse do not necessarily establish that appellant
committed an assault, neither do they disprove it. Thus, we are only left with conflicting testimonial
evidence about the events and about the credibility of the witnesses. We recognize that there may
be some problems with the evidence: some is contradictory; some does not necessarily tie appellant
to the offense alleged; appellant's comments to Lemons and Shelton may not be reliable given the
circumstances under which they were obtained. However, the essential claim of appellant's factual
sufficiency challenge is one of weighing contradictory evidence. The task of determining the
credibility of witnesses and choosing which testimony to believe remains with the jury. (11) See
Johnson, 23 S.W.3d at 8. We will not reverse a conviction on such a claim. See id. Appellant has
not shown that the evidence is so obviously weak as to undermine confidence in the jury's
determination. See id. at 11. Neither has he shown the proof of guilt is greatly outweighed by
contrary proof. See id. We overrule appellant's factual sufficiency challenge. 


CONCLUSION

 Because we overrule all of appellant's issues, we affirm the judgment of conviction.



 __________________________________________

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: February 20, 2004

Do Not Publish
1. The parental rights of S.D.'s mother have been terminated. 
2. Texas rule 803(4) is based on and is identical to the federal rule; therefore, federal case law
is persuasive authority for interpreting and understanding the Texas rule. See Fleming v. State, 819
S.W.2d 237, 247 (Tex. App.--Austin 1991, pet. ref'd).

3. We note that the record contains the testimony of two witnesses who spoke of the
allegations of previous sexual abuse by persons other than appellant.
4. She visited appellant once with Nancy Shelton, a Court Appointed Special Advocates
(CASA) volunteer, who also testified at appellant's trial, and once with another person from CASA.
5. Lemons also related instances of mental-health problems that S.D. exhibited in her foster-care placement, such as talking about suicide, pulling scabs off of her arms, eating staples, and other
behaviors.
6. The jury returned not-guilty verdicts for charges based on those other alleged assaults. 
7. J.V. is Ruiz's eleven-year-old daughter. 
8. These methods have a published error rate of five percent. Navarre explained that the error
rates mean that if one hundred individuals with a particular psychopathy were tested by one of these
methods, a trained treatment provider could detect the presence of the psychopathy in ninety five of
those individuals. 
9. Appellant is a legal permanent resident of the United States.
10. Appellant testified that he never formally learned English and that he mainly thinks in
Spanish. In addition, the record indicates that he had a translator with him while he was testifying
in order to explain more difficult concepts to him in Spanish. Finally, he testified that he has
difficulty constructing sentences in English that reflect English rather than Spanish grammar, and
the record shows some grammatical problems with his spoken English. However, he delivered most
of his testimony unaided. 
11. We note that the jury acquitted appellant of three charges alleging assaults on different
dates and based on identical or substantially similar evidence.