IN THE COURT OF
CRIMINAL APPEALS

                                   OF
TEXAS

 

                                                                              

                                                               NO.
PD-1605-04



 

 

                                       RAY
MITCHELL WILKERSON, Appellant

 

                                                                             v.

 

                                                        THE
STATE OF TEXAS

 



                         ON
STATE=S PETITION FOR DISCRETIONARY REVIEW

                                     FROM
THE SECOND COURT OF APPEALS

                                                           TARRANT 
COUNTY



 

 

Cochran,
J., delivered the opinion of the Court in which Price, Johnson, Keasler, Hervey, and Holcomb, JJ., joined.  Womack, J., concurred in the result.  Meyers, J., not participating.  Keller, P.J., filed a
concurring opinion.

 

 

                                                                  O
P I N I O N 

 








A Child Protective Services (CPS)
investigator interviewed appellant about the removal of his three children from
the home after appellant and his wife were arrested for injury to a child.  The
court of appeals held that the trial court committed reversible error in
allowing the CPS investigator to testify about appellant=s statements made during this
custodial interview because the CPS worker did not administer Miranda
warnings or follow the procedures in article 38.22 of the Texas Code of
Criminal Procedure.[1] 

We hold that only when a CPS
investigator (or other non-law enforcement state agent) is acting in tandem with
police to investigate and gather evidence for a criminal prosecution are such
warnings required.[2]    Here there
was no evidence that the CPS worker was acting in tandem with police officers
when she interviewed appellant.  Thus, the trial court did not abuse its
discretion in admitting appellant=s statements. 

I.

Appellant was charged with injury to
a child for causing serious bodily injury to his three-year-old son, Andrew, by
putting him in a tub of scalding water.  He was also charged with causing
bodily injury to his five-year-old son, Brydon, by hitting him with a belt.  








At trial, Officer John Shelton of the
Crowley Police Department testified that he was dispatched to investigate a
complaint of injury to a child at appellant=s apartment.  He found three-year-old
Andrew lying in bed.  His buttocks were severely burned, and his feet were so
burned that the Askin was webbed together like a fin.@  Officer Sheldon called paramedics
who flew Andrew to Parkland Hospital on an ambulance helicopter.  Appellant=s wife[3]
told the officer that Andrew had been burned three days earlier, on February 7,
2002, and that she and appellant had treated the burns with menthol shaving
cream. 

Later that day, appellant and his
wife went to the home of their neighbor, DeWayne Marshall, a Tarrant County
deputy.  Deputy Marshall and members of his church had befriended appellant=s family when it moved into a nearby
apartment three months earlier.  Appellant=s wife was crying, and she looked
scared.  Appellant, at the deputy=s urging, said that Andrew had been
taken to Parkland Hospital in Dallas and explained, AI lost my temper because I=m under a lot of pressure . . . [S]o
I got a bathtub full of hot water, and . . . I put him down in it to teach him
a lesson.@  Deputy Marshall told appellant that he needed to tell the Dallas police
exactly what had happened, and he gave appellant ten dollars for gas.  Shortly
thereafter, appellant, his wife, and the three other childrenBDaniel, Curtis, and BrydonBreturned to their apartment by car. 
Crowley police officers approached and arrested both appellant and his wife. 
The three children were taken to a foster home.








The next day, CPS investigator Deanna
Lane-Martines met with appellant at the Crowley jail, where he was being held
following his arrest for injury to a child.  She needed to discuss the children=s placement in a foster home because
there were no other parents or family members to care for them.  At trial, she
testified about her legal duties under the Texas Family Code:  AOnce children are removed [from the
home], we haveB once we interviewed the children, we have to notify the parents, speak
to the parents, interview them within a 24-hour period.@  First, she and a co-worker
interviewed Brydon, Curtis, and Daniel.[4]  When she
interviewed Brydon at school that morning, she took pictures of marks on his
buttocks and thighs.  Next, she interviewed appellant and asked him about the
marks on Brydon.








At this point during the trial,
appellant objected to Ms. Lane-Martines=s testimony,[5]
but the judge overruled the objection and admitted the testimony.  Appellant
told Ms. Lane-Martines that he had spanked Brydon several times on February 7th
for soiling his pants. 








The jury convicted appellant of
causing serious bodily injury to Andrew and causing bodily injury to Brydon. 
It assessed his punishment at thirty years= imprisonment on the first charge and
ten years= probation on the second.  On appeal, the court of appeals affirmed
appellant=s conviction and sentence on the first case, but it reversed his
conviction for injuring Brydon and remanded that case for a new trial.  The
court reasoned that when a defendant moves to suppress a statement,[6]
the burden shifts to the State to show that the proper constitutional and
statutory warnings were given.[7]  We assume,
however, that the court meant that the burden shifts if the defendant
proves facts that would support a finding that the interrogator is an agent of
the state.  According to the court of appeals, the State failed to meet this
burden, and therefore the trial court erred in overruling appellant=s oral motion to suppress the
statement.[8] 








The court of appeals=s published opinion in this case
appears to be in conflict with several recent unpublished opinions from two
other Texas courts of appeals.[9]   We do not
normally refer to or rely on unpublished opinions for their precedential value,
but these opinions state that the law in this area is Awell settled,@[10] thus implying that publication was
unnecessary.  Given the conflict in applying our precedent, this area of law
may not be entirely clear.  Thus, we take this opportunity to provide guidance
for the bench and bar on the important legal question:  To what extent do the
statutory requirements that a CPS worker report her independent investigation
results to police make her a police surrogate for purposes of Miranda
warnings when the person she interviews is in custody?

II.








The Fifth Amendment provides that no
person Ashall be compelled in any criminal
case to be a witness against himself . . .@  In Miranda v. Arizona,[11]
the Supreme Court held that the State may not use any statements stemming from Acustodial interrogation of the
defendant unless it demonstrates the use of procedural safeguards effective to
secure the privilege against self-incrimination.@[12]  The Court specifically defined Acustodial interrogation@ as Aquestioning initiated by law
enforcement officers after a person has been taken into custody or
otherwise deprived of his freedom of action in any significant way.@[13]  The Court concluded that compulsion
is Ainherent in custodial surroundings,@ therefore special safeguards are
required in the case of Aincommunicado interrogation of individuals in a
police-dominated atmosphere, resulting in self-incriminating statements without
full warnings of constitutional rights.@[14]  The Supreme Court recognized that
there is a unique danger of coercion in the police-arrestee relationship.[15] 
Thus, the  Miranda rule is intended to guard Aagainst coercive custodial
questioning by police; it protects a suspect from the possibility of physical
or psychological >third degree= procedures.@[16]













Of course, Miranda does not
apply to all custodial questioning.  It generally applies only to questioning
by law enforcement officers or their agents.[17] 
There are two types of Astate agents@:  all those who are employed by any state agency are, by
definition, Astate agents,@ but only those who are working for or on behalf of police
are law-enforcement Astate agents.@  Although state employment clearly makes a person an Aagent of the State,@  that label does not, by itself,
make the person an Aagent of the State@ for the purpose of defining Acustodial interrogation.@[18]  Not all government workers must be
familiar with and ready to administer Miranda warnings or comply with
the procedural requirements of Article 38.22.   As noted by Professor LaFave,
when Athe official has not been given
police powers, Miranda has been held inapplicable to questioning by
school officials, welfare investigators, medical personnel, prison counselors,
and parole or probation officers.@[19]

Our law recognizes that different
types of state employees serve different roles.  It is law enforcement=s job to ferret out crime,
investigate its commission, arrest the perpetrator, and gather evidence for a
possible prosecution.  In pursuing this legitimate goal, the police might be
tempted to use physical coercion or other illegitimate methods to gather a
confession.  The Supreme Court was concerned with this particular power
imbalance and the resulting inherently coercive interactions when it devised
the Miranda warnings.[20]








Child Protective Services (CPS)
workers, on the other hand, have a very different set of goals and
responsibilities.  Their mission is to protect the welfare and safety of
children in the community.[21]  Although
this duty may at times entail the investigation of child abuse claims, that
alone does not transform CPS workers into law enforcement officers or their
agents.[22]  Nor does
the fact a CPS worker is statutorily required to report suspected child abuse
to law enforcement authorities transform a CPS worker into an agent of law
enforcement.  All citizens are statutorily required to report suspected child
abuse to the authorities.[23]  If the
obligation to report suspected child abuse by itself could convert a CPS worker
into a law enforcement agent, then every person who suspects child abuse could 
be called a Alaw enforcement agent@ in the Miranda context.   This is clearly not the
law, and it was certainly not the purpose of the prophylactic Miranda
warnings.








 For the most part, CPS caseworkers,
who are investigating family placement and safety matters, and police officers,
who are investigating criminal matters, run on separate parallel paths.  Both
are interested in gathering information.  While police are collecting
information for an arrest and criminal prosecution, CPS workers are
investigating to find safe housing and protection for abused or neglected
children. When  a state-agency employee is working on a path parallel to, yet
separate from, the police, Miranda warnings are not required.[24]








On the other hand, if the
once-parallel paths of CPS and the police converge, and police and state agent
are investigating a criminal offense in tandem, Miranda warnings and
compliance with article 38.22 may be necessary.[25] 
At this point, a CPS worker may be viewed as an agent of the police.  The term Aagency@ denotes a consensual relationship
which exists between two persons or parties where one of them is acting for or
on behalf of the other.[26]  The law
does not, however, presume an agency relationship.  The person alleging such a
relationship has the burden of proving it.[27] 
But if a defendant does prove that a particular personBwhether CPS caseworker, teacher,
preacher, probation officer, or mere family friendBis, in fact, working for or on behalf
of the police by interrogating a person in custody,  that agent is bound by all
constitutional and statutory confession rules, including Miranda and
Article 38.22.[28]

It is sometimes difficult to
determine whether the two paths, that of the police and that of CPS, are
parallel or whether they have converged in a particular case.  To do so, courts
must examine the entire record.  Central to this evaluation are the actions and
perceptions of the parties involved:  the police, the CPS caseworker (or other
potential agent of the police), and the defendant himself.








First, courts should look for
information about the relationship between the police and the potential police
agent.  Did the police know the interviewer was going to speak with the
defendant?  Did the police arrange the meeting?  Were the police present during
the interview?  Did they provide the interviewer with the questions to ask? 
Did they give the interviewer implicit or explicit instructions to get certain
information from the defendant?  Was there a Acalculated practice@ between the police and the
interviewer that was likely to evoke an incriminating response from defendant
during the interview?[29]  And
finally, does the record show that the police were using the agent=s interview  to accomplish what they
could not lawfully accomplish themselves?[30]  
In sum, was law enforcement attempting to use the interviewer as its anointed
agent?

Second, courts should examine the
record concerning the interviewer=s actions and perceptions:  What was
the interviewer=s primary reason for questioning the person?  Were the
questions aimed at gaining information and evidence for a criminal prosecution,
or  were they related to some other goal?  How did the interviewer become
involved in the case?  Did the interviewer help Abuild a case@ that led to the person=s arrest,[31]
or was the interviewer pursuing some other goal or performing some other duty? 
At whose request did the interviewer question the arrestee?  In sum, did the
interviewer believe that he was acting as an agent of law enforcement?








Finally, courts should examine the
record for evidence of the defendant=s perceptions of the encounter.  When
the defendant was interviewed, did he believe that he was speaking with a
law-enforcement agent, someone cloaked with the actual or apparent authority of
the police?  What gave him this impression?[32] 
Alternatively, would a reasonable person in defendant=s position believe that the
interviewer was an agent of law enforcement?[33]

At bottom, the inquiry is: Was this
custodial interview conducted (explicitly or implicitly) on behalf of the
police for the primary purpose of gathering evidence or statements to be used
in a later criminal proceeding against the interviewee?[34] 
Put another way, is the interviewer acting as an Ainstrumentality@ or Aconduit@ for the police or prosecution?[35] 
Most simply:  is the interviewer  Ain cahoots@ with the police?








                                                                            III.    

Appellant argues that the court of
appeals did not conclude that Ms. Lane-Martines was an agent of law
enforcement.  He contends that the factual findings by the court of appeals
were 

pure dicta.  The court did not rely on them in any way
for its decision, nor were they necessary to that decision.  The courts full
reliance for its holding was that once Appellant moved to suppress, the burden
was on the State to establish the giving of Miranda/38.22 warnings, and
the State did not go forward to meet that burden.[36]

 








We conclude, however, than appellant
misconstrues the law and reads the court of appeals=s opinion too literally.  The mere
filing of a motion to suppress does not thrust a burden on the State to show
compliance with Miranda or article 38.22 warnings unless and until
the defendant proves that the statements he wishes to exclude were the product
of custodial interrogation.  Thus, the State has no burden at all unless Athe record as a whole clearly
establishe[s]@ that the defendant=s statement was the product of
custodial interrogation by an agent for law enforcement.[37]  
It is the defendant=s initial burden to establish those facts on the record.

We turn now to the record in this
case to decide whether the court of appeals was mistaken in holding that the
trial court abused its discretion in implicitly concluding that Ms.
Lane-Martines was not an agent of law enforcement who was required to comply
with Miranda warnings and all of the procedures required under article
38.22.  








This record is, at best, sparse.  The
record does show that Ms. Lane-Martines, the CPS investigator, met with
appellant for the first time on February 11, 2002, when he was already in
custody on the charges concerning Andrew=s burns.  It is unclear from the
record whether the police or the hospital called CPS, but CPS took custody of
the children because both of their parents had been arrested and there were no
other known family members.  What is evident from the record is that Ms.
Lane-Martines visited appellant in jail as part of a routine CPS procedure. 
She had a duty imposed by the Texas Family Code to notify and interview parents
within one working day of their children=s removal from the home.[38] 
It was for this purpose, rather than any law enforcement purpose, that she met
with appellant.  Furthermore, the record fails to show that there was any Acalculated practice@ between Ms. Lane-Martines and the
police which was likely to elicit an incriminating response.  Nor does the
record show that the police used Ms. Lane-Martines to accomplish what they
could not lawfully accomplish themselves.  In fact, it appears that the police
were not involved in the CPS investigation at all.[39]

The court of appeals stated that
appellant proved that Ms. ALane-Martines interrogated him about his culpability
concerning the instant offense,@[40] that appellant was in jail for the
instant offense, that she was employed by a state agency,  that Ashe knew when she went to the jail to
interview appellant that, when she questioned a defendant and made
documentation of what he told her, the report of the questioning would be
forwarded by duty of law to the police agencies[,]@ and that Ashe turned over the results of her
interrogation to the Crowley police; and that information was used as a basis
for prosecuting appellant.@[41] But the mere fact that Ms.
Lane-Martines may have told police about appellant=s incriminating statement is not
sufficient to transform her into an agent of law enforcement. 








There is nothing in the record to
indicate that the investigating police knew about Ms. Lane-Martines=s interview, that they spoke to her
before the interview, that they asked her to question appellant at all or in
any particular manner, or that they made any attempt to use her as a conduit
for interrogation purposes.  Nor is there anything in this record that
indicates that it was Ms. Lane-Martines=s intention to investigate on behalf
of, or in tandem with, the Crowley police.  

Finally, there is nothing in the
record concerning appellant=s perceptions or how he viewed Ms. Lane-Martines=s purposes in asking him about
Brydon.  Therefore, we can only evaluate the situation from the standard of a
reasonable person in appellant=s position.  Ms. Lane-Martines told appellant that she was a
CPS investigator there to interview him and inform him about the Aremoval@ status of his children because there
was no available family member to take custody.  Without more information to
the contrary, we cannot conclude that a reasonable person in appellant=s position would have believed that
Ms. Lane-Martines was an agent of law enforcement.  

In sum, based on this record, the
trial court did not abuse its discretion when it implicitly concluded that Ms.
Lane-Martines was not acting as an Aagent of law enforcement@ for the purposes of Miranda
when she interviewed appellant, and therefore admitted her testimony about
appellant=s statement concerning how he had spanked Brydon.  In this particular
situation, the trial court=s ruling that the CPS investigator was not an agent of law
enforcement was within the zone of reasonable disagreement.  The court of
appeals was mistaken in concluding otherwise.








Therefore, we  reverse the judgment
of the court of appeals, and affirm the judgment of the trial court.

 

Cochran, J.

Delivered: October
5, 2005

Publish









[1]
Wilkerson v. State, 144 S.W.3d 150 (Tex. App.BFort Worth 2004).





[2] 
The State Prosecuting Attorney=s
two grounds for review are as follows:

(1) Is a Child Protective
Services investigator who, while in the course of a child abuse investigation,
conducts an interview with the subject of a report of child abuse while said
subject is in custody, to be considered an agent of law enforcement solely
because the subject makes an incriminating statement and that statement is
subsequently reported to law enforcement by the CPS investigator?

(2) If a Child Protective
Services investigator, while in the course of a child abuse investigation,
conducts an interview with the subject of a report of child abuse while said
subject is in custody, and the subject makes an incriminating statement that is
subsequently reported to law enforcement by the CPS investigator, must the CPS
investigator always have provided to the subject admonishments pursuant to Miranda
v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Vernon=s Ann. C.C.P. art. 38.22,
before the incriminating statement made by the subject will be admissible into
evidence? 

 





[3]
Appellant=s wife,
Sandralyn, was the mother of ten-year-old Daniel.  Appellant was the father of
Curtis, age six, Brydon, age five, and Andrew, age three.  It was a second
marriage for both appellant and Sandralyn.





[4]
Later that day Ms. Lane-Martines went to Parkland Hospital to interview Andrew,
but, because of his medical condition, she was not able to talk to him.





[5]
Appellant=s entire
trial objection and voir dire questioning of Ms. Lane-Martines was as follows:

 

State:                What
did the defendant tell you happened to Brydon?

Defense:           I=ll object, Your Honor.  Let
me ask her a few questions on voir dire.

Court:               To
perfect your objection?

Defense:           Yes,
Your Honor.

Court:               Go
ahead.

By the defense:

Q:                
Are you employed by a state agency?

A:                
Yes.

Q:        Do you
take reports from defendants that are forwarded to the police agencies?

A:         I don=t understand the question.

Q:        ReportsB 

A:         Could
you repeat it.

Q:        If you
question a defendant and make documentation of what they tell you, are those
reports forwarded by duty of law to police agencies?

A:         Yes,
sir.

Q:        Do
those reports sometimes result in the arrest of people?

A:         Based
on my report?

Q:        Yes.

A:         If a
report is made to the police, I don=t
believe they arrest them based on my report.  A report can be made to the
police about a certain incident, and they would investigate it, and an arrest
would be made based on their investigation, not on mine.

Defense:           Your
Honor, I still object based on the fact she is employed by a state agency, she
questions defendants about what crimes that could occur against children, and
she turns those questions over to law enforcement agencies that become parts of
their files and are used to result in the arrest of citizens on charges.

Court:               The objection is
overruled.





[6]
The court of appeals categorized appellant=s
trial objection quoted above as an oral motion to suppress.





[7]
144 S.W.3d at 152.





[8]
The court of appeals stated:

 

When a defendant moves to suppress a
statement, the burden shifts to the State to show that the proper warnings were
given.  Appellant proved that

C                    
Lane-Martines interrogated him about his culpability concerning
the instant offense in the Crowley jail with no attorney present;

C                    
he was incarcerated for the instant offense at the time;

C                    
she was employed by a state agency;

C                    
she knew when she went to the jail to interview Appellant that,
when she questioned a defendant and made documentation of what he told her, the
report of the questioning would be forwarded by duty of law to the police
agencies;

C                    
she turned over the results of her interrogation to the Crowley
police; and that information was used as a basis for prosecuting Appellant.

 

144 S.W.3d at 152 (footnote
omitted).





[9] 
Rodriguez v. State, No. 04-02-00615-CR, 2003 Tex. App. LEXIS 3911 * 2
(Tex. App.BSan Antonio
2003, no pet.) (unwarned statement to CPS officer admissible; Athe record establishes that
when [CPS worker] spoke with Rodriguez she was engaged in conducting a child
abuse investigation, and any incriminating responses she elicited were
exclusively for a legitimate purpose other than law enforcement. . . . [CPS
worker explained that she spoke with defendant] based on DPRS protocol that
required her to visit with both parents, explain the process of the DPRS
investigation, and alert Rodriguez as to what DPRS would be trying to do to
help the family through the situation@);
Carter v. State, No. 05-00-01215-CR, 2001 Tex. App. LEXIS 7746 *4-9
(Tex. App. B Dallas
2001, no pet.) (unwarned statements made during jailhouse interview with CPS
worker admissible; worker met with police officer before interview to determine
a Acase plan@ for interviewing the
children only once; officer never told her to interview defendant; she was
following standard CPS procedure which Arequires
an investigator to interview the principals in a case, including an alleged
perpetrator@; she told
defendant that she was investigating family abuse or neglect and would share
information with police, but that she was not a police officer; court finds
that interview was not Aa
custodial interrogation in violation of Miranda and the Fifth Amendment@); Cordova v. State,
No. 05-00-01320-CR, 2001 Tex. App. LEXIS 4733 * 5-6 (Tex. App. B Dallas 2001, no pet.)
(jailhouse interview by CPS officer did not require Miranda warnings;
defendant failed to prove agency relationship between police and CPS worker who
Atestified it was the
practice of the police department to refer child abuse cases to CPS.  Her job
as a CPS worker was to interview persons accused of child abuse . . . . [but]
the police were not involved in [her] investigation.  They never asked her to
get any information from appellant, did not ask her to assist them in their
criminal investigation, nor did they instruct her what to do when she
interviewed appellant@;
CPS worker testified that she interviewed defendant to Acarry out her responsibilities as a CPS
officer, not for police department purposes@).





[10]
Rodriguez, 2003 Tex. App. LEXIS 3911 * 1 (ABecause
the issues in this appeal are settled by existing precedent, we affirm . . . in
this memorandum opinion@);
Carter v. State, 2001 Tex. App. LEXIS 7746 * 1-2 (ABecause all dispositive
issues are clearly settled in law, we issue this memorandum opinion . . .@).





[11]
384 U.S. 436 (1966).





[12]
Id. at 444. 





[13] 
Id. (emphasis added).





[14]
Id. at 445 & 458.  Article 38.22 of the Code of Criminal Procedure
requires a slightly more elaborate set of warnings than Miranda and adds
the requirements of either a written, signed statement or an audio or video
recording of custodial interrogations by law enforcement. Tex. Code Crim. Proc. art. 38.22.





[15]
Id. at 467 (Awithout
proper safeguards the process of in-custody interrogation of persons suspected
or accused of crime contains inherently compelling pressures which work to
undermine the individual=s
will to resist and to compel him to speak where he would not otherwise do so
freely@); see also
Beckwith v. United States, 425 U.S. 341,  345-46 & n.7 (1976)
(reiterating that the Miranda ACourt
gave great weight to contemporaneous police manuals and concluded that
custodial interrogation was >psychologically
. . . oriented,= and
that the principal psychological factor contributing to successful
interrogation was isolating the suspect in unfamiliar surroundings >for no purpose other
than to subjugate the individual to the will of his examiner=@) (citations omitted).  Like the Supreme
Court, this Court has recognized that custodial interrogation by law enforcement
agents may be inherently coercive.  See Cobb v. State, 85 S.W.3d 258,
262-63 (Tex. Crim. App. 2002).





[16]
Cobb, 85 S.W.3d at 263; see also Doescher v. State, 578 S.W.2d
385, 391, n.6 (Tex. Crim. App. 1978) (Athe
purpose for the prophylactic measures mandated by Miranda was to
mitigate the inherent coerciveness of station house interrogations@).





[17]
Estelle v. Smith, 451 U.S. 454 (1981), and Mathis v. United States,
391 U.S. 1 (1968), are often cited as two possible exceptions to this rule.  In
Smith, the Supreme Court held that the defendant=s non-Mirandized custodial statements
to a court-appointed psychiatrist who interviewed the defendant in jail to
determine his mental competency could not be used against him during the
punishment phase of a capital murder trial to prove future dangerousness.  Id.
at 466-67.  The Court noted the unfairness of using the results of a Acompelled@ interview with a
purportedly Aneutral@ expert designated by the
trial court as evidence to prove his future dangerousness.  AWhen Dr. Grigson went
beyond simply reporting to the court on the issue of competence and testified
for the prosecution at the penalty stage on the crucial issue of [defendant=s] future dangerousness,
his role changed and became essentially like that of an agent of the State
recounting unwarned statements made in a postarrest custodial setting.@  Id. at 467.  In
essence, an agent of the trial judge, himself a state agent, was used to
collect incriminating evidence for the prosecution.  

Similarly, in Mathis, the
Supreme Court held that an IRS tax investigator who interviewed the defendant
in a state prison about his tax returns andBsignificantlyBasked the defendant to sign
a waiver of the statute of limitations on his tax returns, was Ainvestigating@ and collecting evidence
against the defendant for a future legal proceeding while the defendant was Ain custody.@  391 U.S. at 2-4 &
n.2.

While neither
of these two cases fit neatly into the normal Miranda Acustodial interrogation by
an agent of law enforcement@
model, they are both premised upon the fact that the primary purpose of the
state-agent interviewer was the collection of evidence to be used against the
interviewee in a criminal prosecution.  See 2 W. LaFave &  J. Isreal, Criminal Procedure ' 6.10(c) at 623-24 (1991
Supp.). 





[18]Paez
v. State, 681 S.W.2d 34, 37 (Tex. Crim. App. 1984); see also Cates v.
State, 776 S.W.2d 170, 172 (Tex. Crim. App. 1989).





[19]
2 W. LaFave, ' 6.10(c) at 622. 





[20]
See Dickerson v. United States, 530 U.S. 428, 434-35 (2000).  In Dickerson,
the Court reaffirmed Miranda and reiterated its concerns:

In Miranda, we noted that the
advent of modern custodial police interrogation brought with it an increased
concern about confessions obtained by coercion.  Because custodial police
interrogation, by its very nature, isolates and pressures the individual, we
stated that Aeven
without employing brutality, the >third
degree= or [other]
specific stratagems, . . . custodial interrogation exacts a heavy toll on
individual liberty and trades on the weakness of individuals.@  We concluded that the
coercion inherent in custodial interrogation blurs the line between voluntary
and involuntary statements, and thus heightens the risk that an individual will
not be Aaccorded his
privilege under the Fifth Amendment . . . not to be compelled to incriminate
himself.@ 
Accordingly, we laid down Aconcrete
constitutional guidelines for law enforcement agencies and courts to follow.@

Id. (citations omitted;
footnote omitted).





[21] 
See Tex. Fam. Code ' 264.002(a) (stating that
the Department of Protective Regulatory ServicesBCPSBshall A(1) promote the enforcement
of all laws for the protection of abused and neglected children; and (2) take
the initiative in all matters involving the interests of children where
adequate provision has not already been made@).





[22]
See Cates, 776 S.W.2d at 172; Garza v. State, 18 S.W.3d 813, 825
(Tex. App.BFort Worth
2000, pet. ref=d).





[23]
Tex. Fam. Code ' 261.101.  That section
reads:

(a) A person having cause to
believe that a child=s physical or mental health or welfare has been
adversely affected by abuse or neglect by any person shall immediately make a
report as provided by this subchapter.





[24]
Paez v. State, 681 S.W.2d at 37-38; Davis v. State, 687 S.W.2d
78, 81 (Tex. App. - Dallas 1985, pet. ref=d).
For example, in Paez, a CPS investigator interviewed the defendant, who
was in custody for the murder of her husband, to determine the proper placement
of her children.  681 S.W.2d at 36.  This Court held that the CPS worker was
not acting as an agent of law enforcement pursuant to a police practice because
the record did not establish that the defendant=s
statements to the CPS worker were Athe
product of words or actions on the part of the police that were likely to
elicit an incriminating response.@
Id. at 38.  Therefore, we found that the defendant=s statements did not stem
from custodial interrogation by a law enforcement agent, and the CPS worker was
not required to give Miranda warnings or follow the statutory procedures
of article 38.22.  Id.  See generally, Rhode Island v. Innis, 446 U.S.
291, 303 (1980).





[25] 
See Cantu v. State, 817 S.W.2d 74, 75-76 (Tex. Crim. App. 1991); Cates
v. State, 776 S.W.2d at 172; McCrory v. State, 643 S.W.2d 725,
734-35 (Tex. Crim. App. 1982).  For example, in Cates, the evidence
gathered by a CPS caseworker was instrumental to the defendant=s arrest for child abuse. 
776 S.W.2d at 173.  The defendant was in jail on these charges when the CPS
worker interviewed him.  Id.  This Court held that the questions the CPS
worker asked the defendant were Acalculated
to evoke incriminating responses relevant to the pending charges.@  Id. at 173.  In
that case, the CPS worker not only investigated the suspected child abuse, but
followed up with post-arrest interrogation to gather additional evidence for
the criminal prosecution of the case in which she had played a major role in
his arrest.  In such a case, the police and CPS were working in tandem and
moving forward as a team from the inception of the investigation.  Rather than
simply conducting a Aroutine
interview to assist [CPS] in solving the abuse problem within the family unit .
. . . [the CPS worker] was conducting a criminal investigation and officially
operating to assist those police agencies responsible for enforcing the State=s criminal laws.@  Id. at 174.  In
that case, the CPS worker had removed her Achild-protection@ hat and put on an Aevidence-collection@ hat. 





[26]
Ackley v. State, 592 S.W.2d 606, 608 (Tex. Crim. App. 1980).





[27]
Buchoz v. Klein, 143 Tex. 284, 286, 184 S.W.2d 271, 271 (1944).





[28]
See Cantu, 817 S.W.2d at 75; Cates, 776 S.W.2d at 172; McCrory,
643 S.W.2d at 734.





[29]
See Cates, 776 S.W.2d at 172.





[30]
Id. (CPS worker will be categorized as an agent of law enforcement if
the record establishes Athat
when the [defendant] made the admissions, the DHR employee was utilizing her
capacity so as to accomplish what the police could not have lawfully
accomplished themselves@).





[31]
See Cates, 776 S.W.2d at 173.





[32]
Apparent authority arises only through acts of participation, knowledge, or
acquiescence by the principal (the police) that clothe the agent with the
indicia of apparent authority. See NationsBank,
N.A. v. Dilling, 922 S.W.2d 950,
952-53 (Tex. 1996) (per curiam); Southwest Title Ins. Co. v.
Northland Bldg. Corp., 552 S.W.2d 425, 428
(Tex. 1977) (AOnly the conduct of the principal, leading
one to suppose that the agent has the authority he purports to exercise, may
charge the principal through the apparent authority of an agent.@).  Thus, only if there is evidence that the police have acted in some
manner to cloak the third-person with authority to interrogate a suspect on
their behalf and that apparent authority is communicated to the suspect, will
the suspect=s perceptions be relevant.





[33]
As one court has phrased it,

Unless a person realizes that he is
dealing with the police, their efforts to elicit incriminating statements from
him do not constitute Apolice
interrogation@ within
the meaning of Miranda.  It is the impact on the suspect=s mind of the interplay
between police interrogation and police custodyBeach
condition reinforcing the pressure and anxieties produced by the otherBwhich creates Acustodial interrogation@ within the meaning of Miranda. 
It is the suspect=s realization that the same persons who have cut him off from the
outside world, and have him in their power and control, want him to confess,
and are determined to get him to do so, that makes the Ainterrogation@ more menacing than it would be without the custody
and the Acustody@ more intimidating than it would be without the
interrogation. 

State v. Loyd, 425 So.2d
710, 716 (La. 1982).





[34]
See Cates, 776 S.W.2d at 172; Paez, 681 S.W.2d at 37.  Both the
State and appellant note the 2003 revisions to the Family Code in ' 261.301(f) which require Athe highest priority@ reports of child abuse to
be conducted Ajointly@ by a local law enforcement
agency and CPS investigator.  That provision went into effect after this
interview, thus the issue of Ajoint@ investigations is not
presently before the Court, and we express no opinion on the operation of that
statutory provision.  Suffice it to say that Ms. Lane-Martines testified that
she was acting pursuant to her legal duty to notify parents of the emergency
removal of children from the home under '
262.109.





[35]
See People v. Kerner, 538 N.E.2d 1223, 1224-25 (Ill. App. 1989)
(child-services worker acted as a Aconduit
for information@
against defendant in custodial setting where worker requested assistance from
police in his investigation of sexual abuse by defendant on children; defendant
was escorted to interview with worker at police chief=s office by police officer; door was locked
during interview; statement was given on police form; officers and a prosecutor
entered office immediately thereafter and arrested defendant; and the
child-services worker and police officer exchanged information both before and
after interview ).





[36]
Appellant=s position
is that

No matter who interviewed Appellant; no
matter what his custodial status was or for what offense he was incarcerated;
no matter what the investigator knew, or planned to do, or had a duty to do, or
in fact did do; the court=s
single solitary holding remainsBthe
State did not go forward on the warnings issue when the defense moved to
suppress, and the State has simply not challenged that issue in this Court.

Although appellant might
reasonably construe the court of appeals=s
opinion in this manner, we cannot read its opinion as holding that the mere
making of a motion to suppress casts a burden upon the State to show that Miranda
warnings were given.  We conclude that the court of appeals meant that the
State had a burden to show that proper warnings were given because
appellant had proven certain facts.  See note 8 supra.





[37]
Paez, 681 S.W.2d at 36 (emphasis in original) (quoting McCrory v.
State, 643 S.W.2d 725, 734 (Tex. Crim. App. 1982).





[38]
Tex. Fam. Code ' 262.109.





[39]
The entire objection, voir dire, argument, and ruling is quoted in footnote
four.





[40]
144 S.W.3d at 152.  Ms. Lane-Martines said that she had taken pictures at
Brydon=s school of the
marks on his body and that she asked appellant what happened to Brydon.





[41]
Id.  Ms. Lane-Martines testified:  AIf
a report is made to the police, I don=t
believe they arrest them based on my report.  A report can be made to the
police about a certain incident, and they would investigate it, and an arrest
would be made based on their investigation, not on mine.@ Although it is possible to infer from this
statement that Ms. Lane-Martines did, in fact, turn over the results of her
interview to the Crowley police and that the present prosecution was based upon
that report, the trial court was not obliged to reach that conclusion.